EDWARD I. KOCH, as Mayor of the City of New York, et al., Petitioners, v JOHN S. DYSON, as Chairman of the Power Authority of the State of New York, et al., Respondents.

In the Matter of GUY V. MOLINARI, Petitioner, v POWER AUTHORITY OF THE STATE OF NEW YORK et al., Respondents.

In the Matter of ELIZABETH CONNELLY, Petitioner, v POWER AUTHORITY OF THE STATE OF NEW YORK et al., Respondents.

Second Department, March 23, 1982

APPEARANCES OF COUNSEL

*Frederick A.O. Schwarz, Jr.*, Corporation Counsel (*Jay B. Itkowitz, Leonard Koerner, Stephen P. Kramer, John C. Brennan* and *Richard Bowers* of counsel), for Edward I. Koch and another, petitioners.

*Carolyn M. Halk* (*Karen F. McGee, Paul Hollender, Andrew B. McGee, Joel W. Pangborn* and *Catherine M. Paulo* of counsel), for Guy V. Molinari, petitioner.

*Frank V. Ponterio* for Elizabeth Connelly, petitioner.

*Thomas R. Frey* (*Gerald C. Goldstein, Reina Barcan, Wendy M. Lane, Karen A. Kimmel* and *Barry R. Fischer* of counsel), for Power Authority of the State of New York, respondent.

*David E. Blabey* (*Sam Laniado* of counsel), for New York State Board on Electric Generation Siting & the Environment, respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

In these original proceedings pursuant to section 148 of the Public Service Law, petitioners challenge a determination of the New York State Board on Electric Generation Siting and the Environment (Siting Board), which authorized the Power Authority of the State of New York (PASNY) to construct a 700 megawatt fossil fueled power plant at Arthur Kill near Travis, Staten Island. Prior to reaching that determination, the Siting Board, pursuant to section 146 of the Public Service Law, was mandated to consider, *inter alia,* the public need for the facility, compatibility with public health and safety, whether "the facility is designed to operate in compliance with applicable state and local laws and regulations issued thereunder", whether "the facility is consistent with long-range planning objectives", and whether "the facility will serve the public interest, convenience and necessity". However, pursuant to section 146 (subd 2, par [d]), the Siting Board can "refuse to apply any local ordinance, law, resolution or other action or any regulation issued thereunder or any local standards or requirement which would be otherwise applicable if it finds that as applied to the proposed facility such is unreasonably restrictive." PASNY filed its applica-

tion for authorization prior to July 1, 1978; therefore "a determination of necessity for [the] facility made by the power authority of the state of New York pursuant to section ten hundred five of the public authorities law [was] * * * conclusive on the board" (see Public Service Law, § 146, subd 2, par [f]).

On November 13, 1974, prior to filing its application with the Siting Board, PASNY adopted a resolution declaring that there was a public need for the facility. The Siting Board deemed this resolution conclusive on the question of public need and, after considering recommendations made by the State Energy Planning Board in March, 1980, concluded that the facility was also consistent with long-range planning objectives for electric power supply in the State. After considering the evidence presented at the hearing, the Siting Board concluded that the proposed facility's impact on public health and the environment would be "acceptable". With respect to local laws and regulations, the Siting Board concluded that PASNY, "as a state agency", is exempt therefrom by virtue of sovereign immunity and "shifted to the City [of New York] the burden of explaining why specific provisions [i.e., local laws and regulations] should be imposed as certificate conditions."

The primary issues before us are whether PASNY acted rationally when it determined that there is a public need for the facility, whether that determination was conclusive on the Siting Board, whether the Siting Board's conclusion that construction and operation of the facility would be compatible with public health and safety is supported by substantial evidence, and whether the Siting Board's analysis as to the application of local laws and regulations was proper. We conclude that PASNY's determination that there is a public need for the proposed facility is reasonable and that that determination was conclusive upon the Siting Board. Further, since the Siting Board's determination that the facility is compatible with public health and safety is rational and supported by substantial evidence, we will not substitute our judgment for the judgment of the Siting Board (see Public Service Law, § 148, subd 2). However, we reject the Siting Board's conclusion that the City of New

York bore the burden of proving that compliance with local laws and regulations should be imposed as a certificate condition. In our view, before issuing the certificate, the Siting Board is mandated, pursuant to section 146 (subd 2, par [d]) of the Public Service Law, to determine either that the facility is designed to operate in compliance with local laws and regulations or, in the alternative, that the local laws and regulations are unreasonably restrictive. Since the Siting Board must make this determination before issuing a certificate of environmental compatibility and public need, the applicant, in this case PASNY, must bear the burden of proof on the issue. Therefore, we must remit this matter to the Siting Board for further consideration of applicable local laws and regulations.

## I. THE FACTS

PASNY is a public authority, originally created in 1939 to develop hydroelectric power on the Niagara and St. Lawrence Rivers (see L 1939, ch 870). In 1972, the Legislature determined that "there is a shortage of dependable power capacity in the southeastern part of the state and that the public interest requires that the authority assist in alleviating such shortage by providing such base load generating facilities as may be necessary or desirable to contribute to the maintenance of an adequate and dependable supply of electricity for the metropolitan transportation authority, its subsidiary corporations, and the New York city transit authority" (see L 1972, ch 489, § 1, Public Authorities Law, § 1001). As a result, the Legislature authorized PASNY to "construct such base load generating facilities as it deems necessary or desirable to assist in maintaining an adequate and dependable supply of electricity" to these authorities (see L 1972, ch 489, § 2). In May, 1974, the Legislature further extended PASNY's powers, authorizing it to construct, acquire and/or complete generating facilities to provide electrical power not only to the Metropolitan Transportation Authority and the New York City Transit Authority, but also to the Port Authority, the City of New York, the State of New York, the United States, and other public corporations and electric corporations within the metropolitan area of the City of New York (see L 1974, ch 369, § 3). The Legislature also

passed certain "emergency provisions" (see Public Authorities Law, § 1001-a):

"The legislature hereby finds and declares that extraordinary circumstances, including excessive costs, shortages of supply, and the inflated price of fuel threaten the capacity to provide utility service essential to the continued safety, health, prosperity and well-being of the people of the metropolitan area of the city of New York and, by reason of the interconnection and interdependence of electric facilities, the reliability of such service throughout the state and require emergency action by the state and its agencies. It is therefore declared that:

"1. To preserve reliability of electric service in the metropolitan area of the city of New York and throughout the state and to assist in deterring further extraordinary increases in rates for electric service the authority should provide such supplemental electricity for such use in the metropolitan area of the city of New York as is consistent with continuing and maintaining the exemption of interest on authority bonds from the income tax imposed by the Internal Revenue Code of the United States and regulations and ruling thereunder.

"2. It is essential that such electricity be provided at the earliest practicable time.

"3. The authority should be authorized to acquire completed or partially completed generation, transmission and related facilities and fuel and fuel contracts.

"4. Any cost savings realized in the production or delivery of electricity by reason of any such acquisition by the authority shall be passed on to consumers."

Consistent with this legislation, PASNY adopted a resolution on November 13, 1974, which determined: "[T]here is a public need for the construction of base load generating facilities 'to assist in maintaining an adequate and dependable supply of electricity by supplying power and energy, for the metropolitan transportation authority, its subsidiary corporations, the New York city transit authority, the port authority of New York and New Jersey, the city of New York, the state of New York, the United States, other public corporations and electric companies within the met-

ropolitan area of the city of New York within the state of New York, consisting of a 700 MW fossil fueled power plant adjacent to the Arthur Kill plant of Consolidated Edison Co. on Staten Island in Richmond County, New York". On December 26, 1974, PASNY applied to the Siting Board for a certificate of environmental compatibility and public need. The application designated Arthur Kill as the preferred site for the new power plant, and designated Hart Island in New York City, the Quarry site in Dutchess County and the Athens site in Greene County as alternative sites.

Owing to certain "informational deficiencies" in the application, PASNY was required to submit certain amendments to its application. On September 20, 1976, the Siting Board's Chairman determined that the application, as amended, "now meets the minimum statutory requirement for docketing." However, PASNY requested additional time to submit another amendment. On October 29, 1976, PASNY submitted "Amendment No. 8 to its Application for a Certificate of Environmental Compatibility and Public Need", and the application was docketed.

The hearing commenced on March 8, 1977. On October 6, 1977, PASNY advised all parties to the proceeding that "the Hart Island alternative site is withdrawn from the Power Authority's 700 MW fossil fuel application." Thereafter, there were a number of delays initiated by parties opposed to the application. On or about January 13, 1978, after PASNY had submitted its direct case, and the other parties had nearly finished cross-examining PASNY's witnesses, the New York State Department of Health (DOH) moved before the Siting Board for an order directing PASNY to conduct a 12-month study of the waters in and around Arthur Kill to ascertain the potential health risk arising from the proposed use of water from Arthur Kill in the operation of the on-shore natural draft cooling tower at the Arthur Kill Station. DOH explained that it failed to raise this point earlier because it lacked adequate staff and funding. The hearing examiner denied DOH's motion, with leave to renew upon an evidentiary showing that the proposed operation of the cooling tower presented a health hazard. Thereafter, DOH and New York City submitted

testimony on this question, and PASNY submitted rebuttal testimony. Ultimately, the Siting Board found that an additional 12-month study was not necessary as a precondition to certification. But in the meantime, on August 11, 1978, PASNY, at the request of various State and city public officials, commenced a re-evaluation of potential sites, in order to determine whether "another primary site in New York City, other than Arthur Kill, could be found" and, on November 13, 1978, the hearing was adjourned, pending that re-evaluation. Thereafter, PASNY submitted reports on three other viable sites in New York City, but the city was unable to agree on a preferred site. Therefore, PASNY elected to proceed with its application for approval of the Arthur Kill site, and the hearing resumed on November 27, 1979.

During the course of the hearing, PASNY took the position that the "finding of public necessity by the Power Authority is conclusive and that there is no reason to receive and consider information that formed the basis for the finding." However, the New York State Energy Master Plan (SEMP), dated March, 1980, was admitted in evidence to establish that "the facility is consistent with long-range planning objectives for electric power supply in the state" (see Public Service Law, former § 146, subd 2, par [e]). SEMP reaffirmed the State's need for new sources of power amounting to "approximately 1900 MW of new capacity beyond that already under construction, or approved for construction, to maintain adequate reserve margins over the forecast period." SEMP also noted that "there is an overriding need in New York State to reduce oil dependence"; therefore, "[i]n addition to this required capacity [of 1900 MW], it is appropriate to include plans for approximately 2200-2700 MW of additional new capacity to reduce oil consumption." SEMP specifically recommended construction of new generating plants in the down-State area to alleviate the problem of "an over-dependence of oil-fired generation" and the strain on the transmission system in the Hudson Valley corridor, and mentioned Arthur Kill as a "feasible" location for a new facility.

There was extensive and conflicting testimony at the hearing with respect to the potential impact on health from

fossil fuel combustion products and from cooling tower emissions.

The main boiler of the generating facility will burn both refuse and coal. PASNY's application included data compiled by the Environmental Protection Agency (EPA), which analyzed the emissions from a refuse-burning plant in St. Louis. The EPA data indicated that emissions of sulfur oxides, hydrocarbons, carbon monoxide, mercury vapor or chlorine do not change appreciably with the supplemental burning of refuse. Further, it was established at the hearing that the emissions from the burning of coal will be in compliance with State and Federal air quality laws and regulations. However, the emissions of sulfur oxides, nitrous oxides, cadmium, beryllium and mercury will exceed the limits set by New York City's air pollution control code. There was also testimony at the hearing that New York City's emission standards, if enforced, would prevent the operation of any coal-fired electric generating power plant within the geographical boundaries of New York City.

Doctors Lester Bernard Lave and Warren Winkelstein, testifying on behalf of DOH, expressed the opinion that the proposed coal-fired plant will cause an increase in the death rate of the Staten Island population of 0.175 per 100,000 per year and an increase in the death rate of the rest of the New York City population of .0808 per 100,000. Dr. Winkelstein testified that "[t]he increased incremental risk to the individual due to the emissions of the plant is going to be the same no matter where the power plant is sited, but the risk to the population depends entirely upon the size of the population and its characteristics". Adopting the position that there was no absolutely "safe" threshold dose of toxic emissions, Dr. Winkelstein pointedly noted: "[S]ociety has to make a decision as to how much risk they're willing to assume, and it seems to me that people should recognize that there will be some risk from putting up a power plant, although that doesn't mean that they shouldn't be built. One can't build a highway without assuming a certain amount of risk or do anything without some risk."

PASNY presented evidence that toxic emissions will be below threshold levels and will not have a detectable adverse health effect on the Staten Island community. Dr. Frederick Lipfert, testifying on behalf of the Department of Public Service, estimated that the emissions from the proposed facility will increase the risk of death on Staten Island by .0621 per million.

A natural draft cooling tower is proposed for this facility, which will use 222,000 gallons of Arthur Kill water per minute to cool the generators. PASNY estimated that 5,700 gallons or 2.6% of this water will be lost to evaporation, and another 11 gallons per minute would be released into the air in small droplets, known as "drift". Thus, the effect of the discharge of these droplets on air quality is significant. PASNY tested the water for fecal coliform and chemical content over a 12-month period, but did not attempt to identify specific pathogenic microorganisms or viruses.

DOH's witnesses, using a "worst case" assumption of 46,350 viruses per 100 milliliters of water, estimated that the cooling tower could disperse one infectious unit per 14,400 liters of air at the maximum point of impact. Based upon these estimates, DOH urged that PASNY conduct another 12-month study to ascertain the actual viral content of Arthur Kill water.

In response to DOH's contentions, PASNY presented its own "worst case" analysis. Dr. Mark Sobsey estimated the "worst case" as 100,000 infectious units per liter of raw sewage, "[b]ecause this value is about twice the maximum value that has been reported in the literature for U.S. raw sewage", and 10,000 infectious units per liter of unconcentrated water, because "[t]his value is 62.5 times the maximum concentration for a marine water reported in the scientific literature." Assuming that the water in the cooling tower consisted of one part raw sewage and 24 parts water, Dr. Sobsey estimated that the maximum concentration of infectious units per liter of water in the cooling tower would be 13,600. At that rate, a person standing at the maximum point of concentration, 1.3 miles from the tower, would be exposed to one virus every 50 days. However, Dr. Sobsey noted that samples of unconcentrated

Arthur Kill water taken on May 15, 1978 contained a maximum concentration of only 1.8 infectious units per liter. Assuming that the number of infectious units in peak season, late summer and early fall, is 100 times that, or 180 infectious units per liter of unconcentrated water, the cooling tower drift would contain only 5,842 infectious units per liter, which "is only about one-third the ground level virus concentration derived from a worst case analysis".

In rebuttal, Dr. Joseph L. Melnick, testifying on behalf of petitioner Guy V. Molinari, estimated the "worst case" concentration at 1.8 million viruses per liter of raw sewage. Dr. Melnick based his estimate upon studies conducted in, *inter alia,* South Africa and Israel, and acknowledged that the average enteric virus density for sewage in the United States has been estimated at 7,000 plaque-forming units per liter. Dr. Stephen J. Millian, testifying on behalf of the New York City Department of Health, also claimed that Dr. Sobsey underestimated the "worst case". Dr. Millian estimated the "worst case" in nonepidemic years as 219,500 plaque-forming units (which may consist of several infectious units) per liter of raw sewage. His colleague, William B. Pressman, estimated that the cooling tower water would contain 9% raw sewage, and, based upon his estimate, Dr. Millian calculated the "worst case" of viral concentration in the cooling tower makeup water as 39,730 plaque-forming units per liter, nearly three times Dr. Sobsey's estimate of 13,600 plaque-forming units per liter. However, additional testimony revealed that Pressman had estimated the per cent of raw sewage in the water based upon an incorrect calculation of the amount of raw sewage pouring from the Victory outfall. Pressman's calculations and, in turn, Dr. Millian's calculations, were based upon the assumption that 1,800 gallons of raw sewage flowed from the Victory Boulevard outfall per minute. In fact, the Victory Boulevard outfall had a maximum capacity of 1,180 gallons per minute, while the Public Service Commission estimated the actual flow at 122 gallons per minute.

DOH also asserted that the cooling tower could present a risk to public health by dispersing toxic organic chemicals.

However, based upon data compiled by the Environmental Protection Administration, and its own sampling, PASNY estimated that the chloroform concentration in the air dispersed by the cooling tower would be 1/3000th of the occupational threshold limit value for chloroform. Concentrations of benzopyrene would be similarly insignificant. In rebuttal, Dr. Paul Margolin, on behalf of the City of New York, testified that he tested samples of Arthur Kill water which displayed a high degree of mutagenic activity, which indicates the presence of carcinogenic substances. However, those results were unreliable because chloroform had been added to the samples to kill background microorganisms.

In addition to releasing "drift", the cooling tower will also discharge 14,300 gallons of water per minute (6.4% of the water flow) back into Arthur Kill as blowdown. Therefore, PASNY sought a waste water discharge permit, and presented evidence that the discharge would not appreciably affect the temperature of the water, nor the concentration of pollutants. PASNY's witnesses estimated that at points 100 feet from the discharge, the temperature of the water would rise only 1.5 degrees Fahrenheit, which would constitute only .5% of the heat emanating from industrial sources at Arthur Kill. Since water will be lost in the cooling tower, owing to "drift" and evaporation, "[c]onstituents originally in the intake water will be concentrated about 1.4 times" in the discharge. However, the discharge will undergo "rapid diffusion". A witness called by the City of New York testified that the cooling tower would have an adverse effect on dissolved oxygen, but that conclusion was contrary to testimony from PASNY's expert, Grace Ekman, that operation of a natural draft cooling tower would improve the level of dissolved oxygen at Arthur Kill.

In its decision granting PASNY's application for a certificate of environmental compatibility and public need, the Siting Board declined to make an independent determination of public need "because Section 146 (2) (f) of the Public Service Law says that a determination of necessity for a facility by PASNY shall be conclusive on the Siting Board." However, the Siting Board noted that the Arthur Kill facility would "provide part of the 1900 MW [mega-

watts] of new capacity the Energy Planning Board found necessary to maintain adequate reserve margins during the 1979 through 1994 planning period." Further the Siting Board held: "It is undisputed that reducing downstate reliance on oil-fired generating capacity is a desired objective and a primary feature of the State's long-range energy plans. It is also clear that certification of the facility will have the advantageous effect of improving the generation mix available downstate independent of the conversion of existing oil-fired facilities to coal."

On the public health issues, the Siting Board determined "[a]fter giving due weight to the various studies presented * * * the facility's likely impact on public health in New York City and the surrounding area is acceptably small, and will be outweighed by the plant's benefits." Nevertheless, the Siting Board imposed certain conditions to insure that the "acceptable" risk to health would be further reduced. PASNY was directed to submit a plan for funding the closing of the Victory Boulevard outfall, to reduce the amount of raw sewage in the Arthur Kill waters. PASNY was also required to "provide treatment of the cooling tower makeup water to achieve the State's highest microbiological standards for salt water from which edible shellfish can be taken." The Siting Board ordered PASNY to conduct a one-year monitoring program of the "microbiological and chemical content of the Arthur Kill", to determine the specific design for the water treatment program. PASNY's application for a wastewater permit was also subject to "effluent limitations, monitoring requirements and other conditions" to insure the attainment of water quality commensurate with Arthur Kill's status as a class "SD" and class B-2 waterway.

In their proposed findings, the hearing examiners concluded that PASNY was generally exempt from local laws and regulations, because, pursuant to section 1014 of the Public Authorities Law, it is an instrumentality of the State performing a governmental function. However, the examiners believed that section 146 (subd 2, par [d]) of the Public Service Law "requires the Siting Board, as a condition of certification to find that the facility is designed to operate in compliance with applicable state and local laws

in the area of the environment, public health and safety unless waived by the Board as unduly restrictive as applied to the proposed facility * * * Clearly, 'applicable' refers to substance, that is state and local laws and regulations dealing with, among other matters, the environment, public health and safety — the areas with which Article VIII is substantively concerned." Although the Siting Board accepted the position that PASNY is generally exempt from local laws and regulations, it rejected the examiners' conclusion that section 146 (subd 2, par [d]) of the Public Service Law requires a consideration of local laws and regulations. Nevertheless, the Siting Board acknowledged that "many of the City's standards deal with subjects of serious concern". Thus, PASNY was directed to comply with local fire regulations. Further, the Siting Board felt compelled to hold that "New York City air quality standards for sulfur dioxide, nitrogen oxides, cadmium, beryllium, and mercury are unreasonably restrictive in view of existing technology and costs to consumers". The Siting Board also permitted New York City to submit a "list of local standards it wishes to have applied as certificate conditions, along with justification for its requests." However, in the order denying petitions for rehearing, the board rejected New York City's submissions, holding that New York City has "the burden of explaining why specific provisions should be imposed as certificate conditions."

## II. PUBLIC NEED

The Siting Board was created by the Legislature in 1972 "to provide for the expeditious resolution of all matters concerning the location of major steam electric generating facilities * * * in a single proceeding * * * to which access will be open to citizens, groups, municipalities and other public agencies to enable them to participate in these decisions" (see L 1972, ch 385, § 1). At that time, the Legislature made certain policy statements, inter alia (see L 1972, ch 385, § 1): "[T]here is at present and may continue to be a growing need for electric power and for the construction of new major steam electric generating facilities. At the same time it is recognized that such facilities cannot be built without in some way affecting the physical environment where such facilities are located, and in some

cases the adverse effects may be serious. The legislature further finds that it is essential to the public interest that meeting power demands and protecting the environment be regarded as equally important and that neither be subordinated to the other in any evaluation of the proposed construction of major steam electric generating facilities. Without limiting the generality of the foregoing, the legislature finds and declares that under certain circumstances power demands may be regarded as controlling even though the adverse environmental impact may be substantial, but that under other circumstances, given the nature of the resource involved and the public interest in preserving and enhancing the quality of life, the protection of the environment may be regarded as controlling even though this might result in restrictions on the availability of public utility services." Based on these considerations, the Legislature enacted former article 8 of the Public Service Law, setting forth the procedure to be followed by the Siting Board. Before issuing a certificate of environmental compatibility and public need the Siting Board was required to find and determine, *inter alia,* "the public need for the facility and the basis thereof" and "that the facility will serve the public interest, convenience, and necessity, provided, however, that a determination of necessity for a facility made by the power authority of the state of New York pursuant to section ten hundred five of the public authorities law shall be conclusive on the board" (see L 1972, ch 385, § 2, Public Service Law, former § 146, subd 2, pars [a], [f]).

In 1977, the Legislature attempted to repeal that portion of section 146 (subd 2, par [f]) of the Public Service Law which provided that "a determination of necessity for a facility made by the power authority of the state of New York * * * shall be conclusive on the board", but that repeal was vetoed by the Governor. In his veto message, the Governor stated that authorizing the Siting Board to make an "independent determination of the need for any facility proposed to be constructed by PASNY" could impair the contract rights of PASNY's bondholders and would unnecessarily protract hearings already underway (see 4 NY Assembly J 5203 [200th Session, 1977]).

In 1978, former article 8 of the Public Service Law was repealed in its entirety, and superseded by the present version (see L 1978, ch 708, § 2), which mandates that the Siting Board make an independent determination with respect to "public interest, convenience and necessity," but with the proviso that "a determination of necessity for a facility made by the power authority of the state of New York pursuant to section ten hundred five of the public authorities law for which an application for a certificate has been filed prior to July first, nineteen hundred seventy-eight shall be conclusive on the board" (see Public Service Law, § 146, subd 2, par [f]). Simultaneously therewith, the Legislature added section 5-112 (subd 3, par c) to the Energy Law to provide that "on and after January first, nineteen hundred eighty, the specific findings of projected electric demands for the forecast periods in the [energy planning] board's report shall be binding on the [Siting Board]".

In the instant proceeding, one of the petitioners, Elizabeth Connelly, contends that the only finding by PASNY which can be binding on the Siting Board is a finding of "public necessity". Ms. Connelly argues further that even if the PASNY resolution of November 13, 1974 constitutes such a finding of "public necessity", the board was obligated by law to go further and determine for itself whether there is a "public need" for the particular facility proposed. We find no merit in this contention because, in our view, if a particular generating facility will serve "public necessity", a fortiori, there must be a "public need" for new generating power. We note that, in an analogous proceeding pursuant to article 7 of the Public Service Law, PASNY's determination of need was deemed binding on the Public Service Commission because "PASNY, unlike most other power utilities across the State, is a State agency and it would be a duplication of efforts to require two State agencies to make an identical determination, a procedure that could be fraught with ambiguities should each agency reach opposite conclusions" (see *Atwell v Power Auth. of State of N.Y.*, 67 AD2d 365, 374).

The legislative history of article 8 of the Public Service Law also indicates that the Legislature intended that

PASNY's determination with respect to need would be conclusive on the Siting Board if, as in the instant case, the application was filed before July 1, 1978. Where the practical construction of a statute is known to the Legislature, its failure to interfere indicates acquiescence (see *Engle v Talarico,* 33 NY2d 237, 242; *RKO-Keith-Orpheum Theatres v City of New York,* 308 NY 493, 500). In this instance, the Legislature was clearly aware that "public necessity" was being construed as synonymous with "public need", as borne out by the Governor's veto message in 1977. In 1978, the Legislature did interfere, but not with respect to applications filed prior to July 1, 1978. Presently, as to applications filed subsequent to July 1, 1978, the Siting Board is required to make an independent determination of need, but if, as in the instant case, PASNY filed the application prior to July 1, 1978, PASNY's determination is conclusive on the Siting Board (see Public Service Law, § 146, subd 2, par [f]).

However, PASNY's resolution of need is an integral part of the Siting Board's decision, reviewable by this court pursuant to section 148 of the Public Service Law (see *Atwell v Power Auth. of State of N. Y., supra).* Certain legislative findings enacted in 1972 and 1974 (see L 1974, ch 369, § 2, Public Authorities Law, § 1001-a; L 1972, ch 489, § 1) shed light on this issue. The Temporary State Commission on Environmental Impact of Major Public Utility Facilities, in its final report to the Legislature, noted that new generating capacity was needed in the State and, further, that Consolidated Edison might be unable to meet summer load requirements in New York City because of an "inability to locate and place in service large generating units in or adjacent to its service area because of environmental controversies." Thereafter, the Legislature determined, *inter alia,* that "there is a shortage of dependable power capacity in the southeastern part of the state" (see L 1972, ch 489, § 1), and in 1974 found, *inter alia,* that "extraordinary circumstances, including excessive costs, shortages of supply, and the inflated price of fuel threaten the capacity to provide utility service essential to the continued safety, health, prosperity and well-being of the people of the metropolitan area of the city

of New York" (see Public Authorities Law, § 1001-a, L 1974, ch 369, § 2). PASNY's resolution of November 13, 1974 reiterated the findings of the Legislature. Therefore, that resolution cannot be deemed arbitrary, capricious, or lacking in evidentiary support (see Public Service Law, § 148, subd 2, pars [b], [e]).

The City of New York contends, however, that PASNY's resolution is stale and no longer valid on the basis of a change in circumstances. Although the proceeding before the Siting Board proceeded interminably for more than seven years, PASNY's adversaries were partially responsible for this delay. Therefore, the delay alone would not be a sufficient reason to remit the matter to PASNY for reconsideration of the question of need. Were it otherwise, obviously, an endless cycle would ensue as a result of the required Siting Board proceedings and the consequent delays thereby engendered. Further, the State Energy Master Plan (SEMP), dated March, 1980, which was introduced in evidence at the hearing, refutes the city's contention that there has been a significant change of circumstances. SEMP specifically recommended construction of new generating plants in the down-State area to alleviate the problem of overdependence on oil and the strain on the transmission system in Hudson Valley. SEMP also declared that the State needed 1,900 MW of new generating capacity to meet projected electric demands. Pursuant to section 5-112 (subd 3, par c) of the Energy Law, that finding was binding on the Siting Board, which noted in its decision that the Arthur Kill facility would "provide part of the 1900 MW of new capacity the Energy Planning Board found necessary". Since PASNY's resolution of need was reaffirmed in substance as recently as March, 1980, the city's contention that that resolution is no longer valid is without merit.

III. COMPATIBILITY WITH PUBLIC HEALTH AND THE ENVIRON-
MENT

After considering all of the evidence and the recommendation of, *inter alia,* the Department of Environmental Conservation, the Public Service Commission and the De-

partment of Health,[1] and the arguments of petitioners Guy Molinari and the City of New York, the Siting Board concluded that the proposed generating facility at Arthur Kill "will have acceptable impacts on the environment and on public health". ·

Petitioners challenge the sufficiency of the evidence with respect to compatibility with public health and the environment. Petitioner Connelly asserts that "[t]he record is inadequate with regard to the environmental effects of burning RDF [refuse derived fuel]". Although PASNY's application included data from an EPA study of a prototype plant in St. Louis, indicating that toxic emissions do not change appreciably with the supplemental burning of refuse, petitioner Connelly claims that this was not sufficient, "without proof or substantiation that the effects of burning RDF produced in New York City will be substantially the same as for RDF produced in St. Louis." It is also asserted that insufficient empirical data was submitted to the Siting Board. The City of New York points to the condition in the certificate of environmental compatibility and public need, mandating that PASNY conduct a 12-month monitoring program subsequent to certification, as evidence that "uncertainties" exist which should be resolved prior to certification.

However, it can always be argued that more could have been done. In the instant case, PASNY analyzed the available data, and monitored the water at Arthur Kill for a 12-month period to determine fecal coliform and chemical content. PASNY took additional samples in May, 1978 to determine viral content. The Siting Board did not find that additional empirical studies were necessary. The board specifically found that the "risk from * * * use of the Arthur Kill waters is acceptable" and ordered an additional 12-month monitoring program, not because "this study is necessary for purposes of finding the plant's emissions acceptable," but rather, to "provide useful information for the specific design of the cooling system water

---

1. The Commissioner of the State Department of Commerce and the Commissioner of the State Energy Office sat as voting members of the Siting Board and, therefore, participated in the decision-making process. Petitioner Connelly's contention that they did not participate is without merit.

treatment program that PASNY is required to submit" in order to reduce that risk still further.[2]

This court's scope of review is limited to whether the decision and opinion of the board, *inter alia,* are, "supported by substantial evidence in the record and matters of judicial notice properly considered and applied in the opinion" (see Public Service Law, § 148, subd 2, par [b]), are made in accordance with proper procedure (par [d]) and are not "arbitrary, capricious or an abuse of discretion" (par [e]). A determination is supported by substantial evidence if it is supported by "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (see *300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176, 180). The Siting Board's decision sets forth relevant and probative evidence to support each of its conclusions. On the question of viral emissions from the cooling tower, the Siting Board adopted the analysis of the Public Service Commission, which relied in part on Dr. Millian's estimate of the viral content of raw sewage, and also considered other factors, including the fact that some viruses would be inactivated by exposure to heat and sunlight. Based on this analysis, the Siting Board determined that the risk presented was acceptably small. Further, the board credited the testimony submitted by PASNY that the risk posed by other pollutants dispersed by the cooling tower was small enough to be insignificant. With respect to emissions from the main boiler, the board noted that even the objectors found the health risk to be "relatively small". The board acknowledged that the proposed facility would create some risk to public health, but determined that those risks would be outweighed by the benefits. Although obviously petitioners would prefer a no-risk situation, that standard may well be impossible to attain. As Dr. Winkelstein, testifying on behalf of DOH, aptly put it, "[o]ne can't * * * do anything without some risk." The Legislature has delegated to the Siting Board the authority to balance the risks against the benefits, and, unless that authority is exercised in an arbitrary or capri-

---

**2.** PASNY has agreed to the imposition of this condition, and states in its brief that it "is committed to use this pretreatment to achieve the state's Class SA water quality standard for the treated makeup water."

cious manner, this court will not substitute its judgment for that of the Siting Board.

The Siting Board, however, in reaching its determination is obliged to consider each of the factors set forth in section 146 of the Public Service Law. Petitioners assert that the Siting Board failed to adequately consider "possible available sites or alternative available sources of energy * * * and totality of the needs of the people of the state for the facility within the context of the need for public utility services and for protection of the environment" (see Public Service Law, § 146, subd 2, par [g]). Petitioners further urge that the board failed to adequately consider whether the facility is consistent with long-range planning for the protection of the environment, as well as for reliable electric power (see Public Service Law, § 146, subd 2, par [e]). Petitioners also specifically claim that the proposed facility will discharge effluents from its cooling tower "in contravention of the standards adopted by the department of environmental conservation" (see Public Service Law, § 146, subd 2, par [c]). Moreover, petitioners assert that the board acted improperly when it concluded that PASNY was exempt from local laws and regulations, and shifted the burden of proof onto the City of New York to establish "why specific provisions should be imposed as certificate conditions."

The Siting Board's opinion and order discusses alternative sources of energy in detail. As was noted in SEMP, the construction of a plant down-State would alleviate New York City's overdependence on oil, and the strain on the transmission system in the Hudson Valley corridor. Therefore, purchase of Canadian power, which would require use of the "northern transmission corridor," would be an inadequate alternative. SEMP also reaffirmed the State's need for additional generating power; therefore, the conversion of existing facilities to coal would also be an inadequate alternative. The City of New York contends that the Siting Board should have considered "the cumulative impacts of the proposed plant and the five coal conversions planned for in the State Energy Master Plan." However, the Siting Board noted that "there are obstacles in the path of conversions, and how many will ultimately be completed remains

uncertain." The question of whether an environmental obstacle to potential coal conversions exists should be determined at the time the additional conversions take place, rather than in this proceeding.

The Siting Board also gave adequate consideration to alternative sites, and concluded that "air quality and public health considerations favor Athens or Quarry over Arthur Kill," but "the Arthur Kill site is clearly superior to Athens or Quarry from the standpoint of terrestrial ecology, land use, visual and aesthetic considerations, aquatic ecology, water quality and quantity, transmission considerations, and potential noise impact." The Arthur Kill site was also preferred because it is located down-State. The City of New York challenges the sufficiency of these findings, because PASNY did not submit evidence on the health impact of a natural draft cooling tower at the two up-State sites. However, PASNY was not required to "make detailed and expensive studies of every conceivable alternative" (see *Tyminski v Public Serv. Comm. of State of N. Y.*, 38 NY2d 156, 160), and properly concentrated its attentions on the primary site. In any .event, the Siting Board acknowledged that public health considerations favored Athens or Quarry over Arthur Kill, but concluded that this factor was outweighed by other considerations prescribed by the Legislature in section 146 of the Public Service Law.

With respect to the effluent from the cooling tower, PASNY applied for and was granted a wastewater discharge permit. During the course of the hearing, the parties misclassified Arthur Kill as a class II waterway (see 6 NYCRR 702.3), while the Siting Board noted that the Arthur Kill "in the area of the facility * * * has been reclassified as a Class SD waterway." Class SD waterways must contain not less than 3.0 mg/1 of dissolved oxygen at any time (see 6 NYCRR 701.5). Thus, one of the conditions imposed in the permit was that "discharges shall be limited so that the attainment [of that standard] * * * will . not be prevented". In any event, PASNY submitted evidence that operation of the cooling tower would improve the level of dissolved oxygen. On the question of thermal pollution, there was testimony that the temperature at 100

feet from the point of discharge would only rise 1.5 degrees Fahrenheit. Although the blowdown at impact "can be relatively high (94° F) maximum", PASNY's experts assured the Siting Board that the heat would dissipate rapidly, and not harm aquatic life. Unfortunately, the Arthur Kill waters are not in compliance with State regulations governing thermal discharges into estuaries (see 6 NYCRR 704.2 [b] [5]). Therefore, PASNY sought a variance from those criteria (see 6 NYCRR 704.4). On that point, there was testimony that the blowdown from the cooling tower will only be responsible for 0.5% of the heat emanating from industrial sources at Arthur Kill. Thomas E. Quinn, of the Department of Environmental Conservation, and Fred W. Ulrich, of the Department of Public Service, did not believe that this "will contribute materially to this violation or will interfere with the efforts underway to bring the Arthur Kill waters into conformance with these water quality standards." Thus, the Siting Board concluded that the facility "will not discharge any effluent that will be unduly injurious to the propagation and protection of fish and wildlife, the industrial development of the State, and the public health and public enjoyment of the receiving waters."

Incongruously, the City of New York contends that the Siting Board erred when it "failed to include effluent limitations for pollutants" which do not originate from the facility, but which are already in the intake waters. Since some of the water will be lost to evaporation and "drift", the constituents in the water discharged will be concentrated 1.4 times their original levels. The City of New York is concerned that additional concentrations of raw sewage and fecal coliform would be injurious to the environment, yet it continues to disperse this raw sewage into the water in the first instance. PASNY is not responsible for this raw sewage, and is not required to reduce the level of pollutants which it does not create (see *Appalachian Power Co. v Train,* 545 F2d 1351). Nevertheless, PASNY was ordered, as a condition to certification, to close the Victory Boulevard outfall, thus, to some extent, curtailing the level of pollutants. Further, the fact that the cooling tower will alter the concentration of pollutants (see ECL 17-0509)

was considered by the Siting Board, which noted that "the design of the discharge structure provides for a quick return to ambient concentrations." Therefore, the city's contentions are without merit.

IV. COMPLIANCE WITH LOCAL LAWS AND REGULATIONS

PASNY is "a body corporate and politic, a political subdivision of the state, exercising governmental and public powers, perpetual in duration" (Public Authorities Law, § 1002). Therefore, PASNY has asserted throughout these proceedings that it is exempt from the requirements of subdivision 2 of section 146 of the Public Service Law, which insofar as is pertinent herein, provides as follows:

"2. * * * The board may not grant a certificate for the construction or operation of a major steam electric generating facility, either as proposed or as modified by the board, unless it shall first find and determine * * *

"(d) that the facility is designed to operate in compliance with applicable state and local laws and regulations issued thereunder concerning, among other matters, the environment, public health and safety, *all of which shall be binding upon the applicant,* except that the board may refuse to apply any local ordinance, law, resolution or other action or any regulation issued thereunder or any local standards or requirement which would be otherwise applicable if it finds that as applied to the proposed facility such is unreasonably restrictive in view of the existing technology or the needs of or costs to consumers whether located inside or outside of such municipality. The board shall provide the municipality an opportunity to present evidence in support of such ordinance, law, resolution, regulation, or other local action issued thereunder." (Emphasis supplied.)

As a governmental body, PASNY is exempt from local laws and regulations so long as it is performing a governmental as distinguished from a proprietary function (see *County of Westchester v Village of Mamaroneck,* 22 AD2d 143, affd 16 NY2d 940; *City of Rochester v Town of Rush,* 67 Misc 2d 328, affd 37 AD2d 795; *Conners v New York State Assn. of Retarded Children,* 82 Misc 2d 861; *People v Witherspoon,* 52 Misc 2d 320). The operation of an electrical power plant may once have been considered a proprietary function (see

*Matter of Village of Boonville v Maltbie,* 245 App Div 468, affd 272 NY 40). However, "the demarcation between governmental or proprietary interests in property owned or operated by government or its subdivisions [is] no longer * * * as clear as it was in the past" (see *County of Nassau v South Farmingdale Water Dist.,* 46 NY2d 794, 796; *Nehrbas v Incorporated Vil. of Lloyd Harbor,* 2 NY2d 190; *People v Witherspoon, supra).* Governmental functions are now more liberally defined to include activities which are not undertaken for profit-making purposes, but, rather, as a public duty (see *County of Nassau v South Farmingdale Water Dist.,* 62 AD2d 380, affd 46 NY2d 794, *supra).* In this instance, the Legislature determined that the private sector lacked sufficient resources to insure a dependable supply of electricity in the New York City metropolitan area, and delegated to PASNY the authority to alleviate what it characterized as "extraordinary circumstances" (see Public Authorities Law, § 1001-a). Thus, the Legislature has seen fit to characterize the construction and operation of electrical power plants as a public governmental function.

But that does not conclude our inquiry. When the Legislature created the Siting Board in 1972, it amended section 1014 of the Public Authorities Law to provide that PASNY was subject to the provisions of article 8 of the Public Service Law (see L 1972, ch 385, § 3), including section 146 (subd 2, par [d]). Section 146 (subd 2, par [d]) specifically states that the applicant is bound by "applicable" laws and regulations. Article 8 of the Public Service Law and the conforming amendment to section 1014 of the Public Authorities Law were enacted subsequent to section 1002 of the Public Authorities Law and for a specific purpose. Therefore, pursuant to general rules of statutory construction, these provisions take precedence over section 1002 of the Public Authorities Law, which is general in scope and application (see *Matter of Martinis v Supreme Ct. of State of N.Y.,* 15 NY2d 240, 249; McKinney's Cons Laws of NY, Book 1, Statutes, § 397).

However, PASNY contends that the Legislature, by using the word "applicable," intended to exempt PASNY from that provision, because local enactments, by virtue of sovereign immunity, are not "applicable" to PASNY. If

that were the Legislature's intent, it certainly could have expressed it in clearer language, such as the explicit language in former section 146 (subd 2, par [f]), that "a determination of necessity for a facility made by the power authority of the state of New York pursuant to section ten hundred five of the public authorities law * * * shall be conclusive on the board". In the absence of similarly explicit language in present section 146 (subd 2, par [d]), PASNY's argument is tenuous at best, and contradicted facially by the actual language of that section.

When article 8 of the Public Services Law was first enacted in 1972 (L 1972, ch 385), the Governor, in his memorandum in support of the bill, noted that "[l]ocal ordinances and regulations would also be applied except where they were expressly and specifically found to be unreasonable" (see NY Legis Ann, 1972, pp 248, 251). No mention is made of any exemption from this provision, nor can PASNY point to any reference to such claimed exemption from any other source. Instead, PASNY must rely on the conclusion of the Siting Board, that local laws and regulations were not "applicable" to the proposed facility because PASNY is the applicant. Since the Siting Board has been entrusted with the implementation of article 8, its interpretation of section 146 (subd 2, par [d]) is entitled to respect, but it is by no means dispositive (cf. *Matter of Lezette v Board of Educ.,* 35 NY2d 272, 281).

PASNY claims that article 8 is merely a forum statute and not a substantive statute. However, this characterization cannot withstand close scrutiny. The Siting Board was created to "provide for the expeditious resolution of all matters * * * in a single proceeding", but was also created to permit a broad participation in such proceedings by citizens and citizen groups, as well as by municipalities and other public agencies (see L 1972, ch 385, § 1). As an umbrella agency, the Siting Board has duties which could not be performed by any of the diverse agencies whose functions it has assumed. It must balance the need for the facility against environmental considerations, and determine "that the facility is consistent with long-range planning objectives for electric power supply in the state, including an economic and reliable electric system; and for

protection of the environment" (see Public Service Law, § 146, subd 2, par [e]). The very provision in question contains elements which are plainly substantive, e.g., the Siting Board may determine that a local requirement is "unreasonably restrictive in view of the existing technology or the needs of or costs to consumers" (see Public Service Law, § 146, subd 2, par [d]).

Although the Siting Board concluded that PASNY was exempt as a matter of law from local laws and regulations, it found the question of the application of the local laws and regulations rather troublesome. The board recognized that "many of [New York] City's standards deal with subjects of serious concern". Therefore, the board created a new *ad hoc* procedure, whereby the City of New York bore the burden of explaining why specific provisions of its local laws and regulations should be imposed. With respect to New York City's Fire Prevention Code, the board found that the city had established "compelling reasons to condition a certificate for this plant upon PASNY's adherence to the substance of the City's Fire Prevention Code", and directed that PASNY comply. However, the board rejected the city's submission of additional laws and regulations, because "the City has not in fact satisfied its burden with its vague allusions to its 'police powers,' its interest in health and safety, and its suggestion that City laws and regulations contain 'presumptively reasonable' standards." The board also held that New York City's air quality standards are unreasonably restrictive, but in light of its determination that local laws and regulations were not "applicable" pursuant to section 146 (subd 2, par [d]), the board acted upon an erroneous assumption as to the burden of proof in reaching that determination.

The fact that the Siting Board thought it necessary to devise this *ad hoc* procedure for dealing with local laws and regulations underscores the problems with its interpretation of section 146 (subd 2, par [d]) of the Public Service Law. If local laws and regulations are not "applicable" pursuant to that provision, there is a gaping hole in article 8. Since the legislative intent was to create an all-encompassing procedure, there is clearly something wrong with this interpretation. The interpretation of the hearing ex-

aminers that " 'applicable' refers to substance, that is state and local laws and regulations dealing with, among other matters, the environment, public health and safety — the areas with which Article VIII is substantively concerned", is far more logical and consistent with the legislative history of article 8.

For these reasons, we hold that PASNY is not exempt from the requirements of section 146 (subd 2, par [d]) of the Public Service Law, and that the Siting Board's determination on that question was erroneous. Thus, the determination of the Siting Board must be annulled, and the matter remitted to the Siting Board for a rehearing on the question of whether the proposed facility is designed to operate in compliance with local laws and regulations, or, if not, that said local laws and regulations are unreasonably restrictive as applied to the proposed facility, with the burden of proof resting upon PASNY. The hearing should be reopened to give PASNY the opportunity to satisfy its burden of proof on these questions and to provide other parties the opportunity to be heard.[3]

In so holding, we do nothing more than give effect to the unambiguous intent of the subject legislation. Clearly this legislation reflects an effort to establish a rational balance between a program geared to best utilize the State's resources in providing a sufficient and economical source of electricity and the need to insure that such program proceeds with a maximum recognition of the health, safety, environmental, ecological and other valid concerns of the local communities in which such facilities would be located. Both the legislative history and the Governor's memorandum (see NY Legis Ann, 1972, p 248) make abundantly clear the legislative intent to compel compliance with the local laws and regulations, except in those extraordinary instances where PASNY establishes that such local laws and regulations are unreasonable. Thus, it is not the city which bears the burden of proof, but PASNY which must demonstrate to the Siting Board that the local

---

**3.** Petitioner Molinari's contention that article 9 of chapter 57 of the New York City Administrative Code has been incorporated into the State implementation plan is not borne out by the record. However, on rehearing, said petitioner, if so advised, may submit additional material on this point.

laws and regulations in question are unreasonably restrictive. Only in this way may the legitimate interests of a local community be furthered and protected as intended by the legislation.

Finally, we note that we are not unsympathetic to our distinguished dissenting colleague's deep concern over the possible effects of the proposed power plant on the health and safety of the people of Staten Island. In our view, however, the approach taken by the dissenter is fundamentally inconsistent with our function on this appeal. He has carefully parsed the record, extracting all evidence which would militate against the granting of the application, and has presented it in an attempt to demonstrate that the application should have been denied. The task of weighing conflicting evidence, however, is properly left to the Siting Board. Our function on review is, as earlier stated, limited to determining whether the board's decision is supported by substantial evidence in the record and whether it has been reached in accordance with proper procedure, rather than to substitute our judgment for that of the Siting Board.

Our review of the record in its entirety convinces us that the board's determination was in fact supported by substantial evidence and, since we conclude that the only flaw in the proceedings was the improper allocation, as a matter of law, of the burden of proof with respect to the applicability of local laws and regulations, we adopt the remedy of remitting the matter to the Siting Board for a rehearing on that limited issue.

TITONE, J. (concurring in part and dissenting in part). I am in accord with the conclusion reached by the majority that the New York State Board on Electric Generation Siting and the Environment (Siting Board) erred in holding that the Power Authority of the State of New York (PASNY) was exempt as a matter of law from applicable local laws and regulations of the City of New York relating to environment, public health and safety. Both the board and PASNY took the untenable position that the latter somehow enjoys sovereign immunity from relevant regulatory ordinances of the municipality in which the proposed site is located, which immunity stems from its purported

status as a governmental State agency. Such reasoning is fallacious and without a basis in law.

Contrary to dictum contained in *Atwell v Power Auth. of State of N. Y.* (67 AD2d 365, 374), PASNY is not a State agency or department. Pursuant to statute it was created as a "corporate municipal instrumentality of the state * * * a body corporate and politic, a political subdivision of the state, exercising *governmental and public powers*" (Public Authorities Law, § 1002, emphasis supplied). Consistent with entities such as the Thruway Authority, PASNY "*'is an autonomous public corporation, with an existence separate and independent from the State'*" (*King v Power Auth. of State of N. Y.*, 60 AD2d 925-926, emphasis supplied; see, also, *Cole v State of New York,* 64 AD2d 1023). Statutes granting powers to a public corporation should be strictly construed, and powers not essential to the furtherance of the purpose of the corporation should not be implied where they are not stated in the statute (81A CJS, States, § 142). With respect to PASNY, the sole statutory exemption it enjoys under the Public Authorities Law is an exemption from taxation (Public Authorities Law, § 1012). That the Legislature intended that PASNY should not be "exempt" or "immune" from relevant laws and regulations of municipalities is clearly evident from the following language contained in its legislative findings when it enacted former article 8 of the Public Service Law in 1972 (L 1972, ch 385, § 1): "The legislature therefore hereby declares that it shall be the purpose of this Act to provide for expeditious resolution of all matters concerning the location of major steam electric generating facilities *presently under the jurisdiction of multiple state and local agencies,* including *all matters of state and local law,* in a single proceeding in which the policies heretofore described shall apply and to which access will be open to citizens, groups, municipalities and other public agencies to enable them to participate in these decisions." (Emphasis supplied.)

Thus, as the majority correctly observed, the Siting Board is mandated to decide, *based on a full record,* (a) whether the proposed facility is designed to operate in compliance with local laws and regulations, or, (b) in the

alternative, whether such laws and regulations are, *inter alia,* unreasonably restrictive as applied to the facility, with the burden of proof devolving upon PASNY (see Public Service Law, § 146, subd 2, par [d]).

In reaching its conclusion that the City of New York had the affirmative duty of proving that specific provisions of its local laws and regulations should be imposed or considered by PASNY, the Siting Board either overlooked or ignored the following pertinent language found in sections 141 (subd 1), 142 (subd 1, par [c]), and 146 (subd 2, par [d]) of the Public Service Law:

"§ 141. Board certificate

"1. * * * [N]o persons shall * * * begin the construction of a major steam electric generating facility in the state without having first obtained a certificate issued with respect to such facility by the board. Any such facility with respect to which a certificate is issued shall not thereafter be built, maintained or operated except in conformity with such certificate and any terms, limitations or conditions contained therein, provided that nothing herein shall exempt such facility from compliance with state law and regulations thereunder subsequently adopted or *with municipal laws and regulations thereunder not inconsistent with the provisions of such certificate.*" (Emphasis supplied.)

"§ 142. Application for a certificate

"1. An applicant for a certificate shall file with the chairman of the board an application, in such form as the board may prescribe containing the following information and materials * * *

"(c) studies, identifying the author and date thereof, which have been made of the expected environmental impact and safety of the facility, both during its construction and its operation, which studies are sufficient to identify * * * (v) how the *construction and operation of the facility,* including transportation and disposal of wastes *would comply with environmental health and safety standards, requirements, regulations and rules under state and municipal laws*". (Emphasis supplied.)

"§ 146. Board decisions * * *

"2. The board shall render a decision upon the record either to grant or deny the application as filed or to certify the facility upon such terms, conditions, limitations or modifications of the construction or operation of the facility as the board may deem appropriate * * * The board may not grant a certificate for the construction or operation of a major steam electric generating facility, either as proposed or as modified by the board, unless it shall first find and determine * * *

"(d) *that the facility is designed to operate in compliance with applicable state and local laws and regulations issued thereunder concerning,* among other matters, *the environment, public health and safety, all of which shall be binding upon* the applicant, except that *the board may refuse to apply any local ordinance, law, resolution or other action or any regulation issued thereunder or any local standards or requirement which would be otherwise applicable if it finds that as applied to the proposed facility such is unreasonably restrictive in view of the existing technology* or the needs of or costs to consumers whether located inside or outside of such municipality." (Emphasis supplied.)

Furthermore, any doubt still existing in one's mind after reading the above statutory excerpts concerning whether PASNY has the burden of proving that local laws and regulations are unreasonable and unduly restrictive vis-à-vis a proposed site, should be completely dispelled by the following provisions found in 16 NYCRR 71.9, which implement article 8 of the Public Service Law:

"Applicable laws, regulations, and standards. (a) (1) The applicant, in its direct testimony and as part of the exhibit information required to be submitted by Parts 72 through 80 of this Title, shall explain the extent to which the location, design, construction, operation, and maintenance of a proposed facility at a proposed site is designed to comply with each Federal and State law, rule, regulation or standard, interstate compact, and international requirement relevant and material to a determination of the application. If the location, design, construction, operation or maintenance of a proposed facility at a proposed site will

not be in full compliance with each such Federal and State law, rule, regulation, or standard, interstate compact, or international requirement under all circumstances, the applicant shall describe in detail any limitation or procedure it proposes to assure compliance under such circumstances or otherwise justify the nonconforming aspects of the proposed facility.

*"(2) The applicant shall also demonstrate either:*

"(i) that the location, design, construction, operation, and maintenance of a proposed facility at a proposed site will comply with each applicable municipal ordinance, law, resolution, regulation, standard, or requirement; or

"(ii) *that, with respect to any particular ordinance, law, resolution, regulation, standard or requirement, why that particular ordinance, law, resolution, regulation, standard, or requirement is unreasonably restrictive in view of the existing technology or of the needs of, or costs to, consumers whether located inside or outside of such municipality."* (Emphasis supplied.)

However, contrary to the majority I find that other serious errors were committed by the Siting Board in this matter. Thus I do not concur with remanding the matter to the Siting Board for a rehearing on the issue of applicability of the city's laws and regulations; but based on its erroneous determinations as to such rules and regulations, and for the following additional reasons, I vote, (a) to vacate the certificate of environmental compatibility and public need granted PASNY and (b) to dismiss the application for such certificate.

### PROOF OF NEED

In the opening statement supporting its application for a certificate of compatibility and need, PASNY asserted: "The foregoing Resolution adopted by the Trustees of the Applicant are, pursuant to Section 146 (f) of the Public Service Law, conclusive upon the Board with respect to the question of the need for the facility. *Therefore, the Rules and Regulations pertaining to public need are not required to be met in the Application. Insofar as the Application contains data and studies relating to that subject, they are*

*submitted for informational purposes only."* (Emphasis supplied.)

In taking such an arbitrary and capricious position, PASNY acted in derogation of requirements set forth in section 142 of the Public Service Law entitled "Application for a certificate", and provisions in the Department of Public Service Rules and Regulations which implement the statutory requirements, to wit, 16 NYCRR 70.2 and 72.1. Set forth in the statute and its implementing rules is the following clear and unequivocal language:

"§ 142. Application for a certificate

"1. An applicant for a certificate shall file with the chairman of the board an application, in such form as the board may prescribe containing the following information and materials * * *

"(e) *a statement explaining the need for the facility including (i) reasons that the facility is necessary or desirable for the public welfare and is not incompatible with health and safety"*. (Emphasis supplied.)

"70.2 Requirements for an application * * *

"(b) The applicant's written testimony in support of its application shall * * *

"(2) analyze its case in terms of the facts and conclusions the board must find and determine under paragraphs (a) through (g) of subdivision (2) of section 146 of the Public Service Law".

"72.1 * * * Need for a facility. The applicant shall: (a) provide an analysis of the need for the proposed facility, taking into account existing and planned generation and transmission facilities of the applicant and of the State-wide power system and practically available and technically feasible sources of power from outside the State, including a statement of any system reliability and safety criteria upon which the need for the proposed facility is based".

Under the above-quoted language, on the issue of need, it is manifestly clear that PASNY is required to submit more than incidental and cursory material for "informational purposes only" on a vital issue in its application for a

certificate. It is incumbent upon it under the statute to furnish detailed information and in-depth analysis with respect, *inter alia,* to the issue of need in order that each party appearing at the Siting Board hearing may have an opportunity to adduce evidence and render arguments either supporting or controverting the position taken by PASNY on such issue. Absent such information and evidence herein, the record is incomplete, and correspondingly there is little or nothing to permit adequate Appellate Division review pursuant to section 148 of the Public Service Law vis-à-vis PASNY's resolution of need (cf. *Atwell v Power Auth. of State of N. Y., supra,* pp 374-375).

Interestingly, the majority is likewise critical of the action taken by PASNY in sloughing off its obligations with respect to what must be contained in an application submitted by it pursuant to section 142 of the Public Service Law. Following its conclusion that PASNY's resolution of need, although binding upon the Siting Board, nevertheless is reviewable by this court, the majority criticizes PASNY for taking the "position [at the hearing] * * * that there is 'no reason to receive * * * information that formed the basis for the finding [of need].'" Nevertheless it then opines that since PASNY's resolution of November 13, 1974 reiterated the findings of the Legislature in 1972 and 1974, pertaining to meeting shortages of dependable electric power capacity in the southern part of the State (i.e., the New York City metropolitan area), such resolution cannot be deemed arbitrary or capricious or lacking in evidentiary support.

In my opinion such argument is untenable. First of all the majority does not address itself to the fact that at the Siting Board hearing, evidence directly relating to the issue of need, other than the statutory findings, was not permitted to be presented. Such fact is conceded by PASNY in its brief on review, when it states: "The Examiners and the Board correctly interpreted this exemption [demonstration of need] *to preclude any evidentiary exploration of the need question."* (Emphasis supplied.)

Second, what the majority has done in ratifying the action of the Siting Board on the issue of need based on

legislative findings, is to hold in effect that legislative findings may be utilized (1) in lieu of the moving party's obligation to plead and prove an essential facet of its case, and (2) also to preclude the admission of evidence on such issue in opposition to the position taken by PASNY. However, a legislative finding may not be used for such purposes.

A contemporaneous legislative declaration or finding contained in a statute may best be defined as an interpretation placed upon a statute at the time of enactment and also the stated reasons for its enactment (cf. 73 Am Jur 2d, Statutes, § 179; *Velishka v City of Nashua,* 99 NH 161). It follows, therefore, that in the absence of a clear indication to the contrary, a legislative finding, although entitled to probative value, should not be employed as a substitute for matter that must be set forth in an application or pleading. Neither should legislative recitals or findings be used for the purpose of precluding competent evidence from being adduced at a trial or hearing related to an issue in dispute whether it be in support or in opposition thereto. Recitals in public statutes of matters of fact, although admissible on an issue as to such fact, and while entitled to great weight, *are not conclusive between the parties affected, or binding on the court* (see *Home Owners' Loan Corp. v Oleson,* 68 SD 435; 82 CJS, Statutes, § 318). It is well recognized that findings of fact made by the Legislature must actually be findings of fact. They are not entitled to the presumption of correctness if they are nothing more than recitations amounting to conclusions, and they are always subject to judicial inquiry (*Seagram-Distillers Corp. v Ben· Greene, Inc.,* 54 So 2d 235 [Supreme Ct, Fla,· en banc]).

Thus I am of the opinion that PASNY, having failed to furnish information and an in-depth analysis on the issue of need in its application pursuant to section 142 of the Public Service Law, and the fact that evidence on such issue was improperly denied admittance at the Siting Board hearing, the determination of need by PASNY is based upon an incomplete record and thus not reviewable by this court pursuant to section 148 of the Public Service Law.

ALTERNATE SOURCES OF POWER

Section 146 (subd 2, par [g]) of the Public Service Law provides, *inter alia:*

"§ 146. Board decisions * * *

"2. The board shall render a decision upon the record either to grant or deny the application * * * The board may not grant a certificate for the construction or operation of a major steam electric generating facility, either as proposed or as modified by the board, unless it shall first find and determine * * *

"(g) that the facility is in the public interest, considering the * * * possible available sites or *alternative available sources of energy, as the case may be, both within the state and elsewhere".* (Emphasis supplied.)

The statutory language quoted above clearly requires that the board render findings of fact on the question of alternate sources of energy. The board, in its order and opinion issued February 26, 1981, recognized this statutory obligation albeit in an oblique fashion. It did concede that consideration given to alternate energy sources in the State Energy Master Plan (SEMP) proceeding and recommendations of the Energy Planning Board (EPB) were not substitutes for an applicant's consideration of alternate practical sources of power or for the board's consideration of such possibility. According to the board, it was required, "by the terms of Article VIII, to conduct [its] own independent and site-specific assessment of alternatives within that framework and those objectives." Despite such assertion, the board relied almost exclusively on the SEMP hearing and the recommendation of the EPB in rejecting the alternate forms or sources of power.

With respect to the purchasing of power, it seems obvious that the board foreclosed all meaningful testimony in support of it as an alternative energy source. By its own admission the board refused to allow the City of New York's counsel to question a PASNY witness as to whether it could delay its plans for a new facility and still serve its load, load growth and capacity requirements.

The board also sought to discount alternate energy sources by placing meaningless conclusory statements in

the record. For example, when the city pointed out that the EPB report concluded that the city's electric system should have economic interconnections with neighboring systems, PASNY responded, and the board concurred, that the proposed facility at Arthur Kill is "entirely consistent with the SEMP." Evidently the board erroneously believed that such *non sequitur* was a sufficient response to render the record complete on the matter since it provided no other reason for the rejection of this apparently feasible option. Similarly, although the board admits that the EPB report calls for a "careful study" of the option of purchasing power from non-Canadian sources, it concludes off-handedly that "the record on alternative energy sources is not made insufficient by the absence of a more detailed consideration of power purchases."

It should be noted at this point that neither PASNY nor the board ever considered the feasibility of a combination of "Canadian power" and "purchased power" from interconnecting neighboring systems as an alternative to the proposed plant. This "combined" alternative, because of its economic, environmental and logistical feasibility, would appear to be significant in view of (a) the EPB's recommendation that the purchase of non-Canadian sources of power be "carefully studied", and also (b) the fact that on July 11, 1973, PASNY passed a resolution of "need" under article 7 of the Public Service Law in order to facilitate the transmission of Canadian power from that country to New York City for *inter alia,* the Metropolitan Transportation Authority and the New York City Transit Authority. The transmittal of such Canadian power was designed by PASNY at that time to *eliminate the need for the construction of a polluting fossil fueled plant in the southeastern part of New York State.* (See *Atwell v Power Auth. of State of N. Y.,* 67 AD2d 365, 375-376, *supra.*)

That PASNY made no serious effort to study the feasibility, *inter alia,* of alternate sources of power, may be gleaned from the following colloquy that took place at the hearing involving Judge LEVY, the hearing examiner, Frank Ponterio, the *ad hoc* member of the board, and Gerald Stillman, Principal Research and Development Engineer for PASNY:

"JUDGE LEVY * * * I take it, you did not go into meeting *the needs of the Power Authority from outside the State of New York or the availability of facilities* outside the state?

"WITNESS STILLMAN: *That is correct, sir* * * *

"MR. PONTERIO: I don't understand your comment that it was desired to have the facility in New York City. It seems to me that the location of this site is or should have been a conclusion of studies * * *

"WITNESS STILLMAN: Insofar *as the siting panel was concerned itself, it was given certain directives by Power Authority management.* Power Authority management had decided on the fossil and the nuclear plant. I was only very peripherally involved in those deliberations. *I was working under those constraints. I believe there may have been some kind of arrangement with the IRS because if* [sic] *the tax-free bond nature of the Power Authority bond that played a role in the choice of the type of plants.*

*"Beyond that, I really can't offer any more. We were functioning under certain directives."* (Emphasis supplied.)

What seems evident from Stillman's astounding admission above, is that the tax exempt status of PASNY's bonds played a predominant role in the selection of the Arthur Kill site for the proposed facility. Accordingly, I am of the opinion that the decision of the board with regard to available sources of energy is not supported by substantial evidence in the record.

### ENVIRONMENTAL IMPACT/COMPATIBILITY WITH PUBLIC HEALTH AND SAFETY

#### A. BOILER EMISSIONS

At the Siting Board hearing, testimony, essentially uncontroverted, was adduced from witnesses for the Departments of Health of the State and City of New York on the high incidence of air pollution in and around the site, and the possible deleterious health effects of smokestack emissions from the proposed plant's boiler.

It was noted in such testimony that already present in the New York-New Jersey area surrounding the Arthur Kill site, were large regions in which air pollutant concen-

trations periodically exceed the standards set by the city, State and Federal governments. In certain areas such as the Goethals Bridge, Tottenville High School, Fresh Kills, Bayonne and Perth Amboy, concentrations were sufficiently high to cause concern regarding long-term effects on health. Nevertheless, into such an environment, the proposed plant was designed to emit annually from the burning of coal, 6,600 tons of sulphur dioxide, and 13,700 tons of nitrogen oxides.

In a Health Systems Plan for 1978 issued by the Health Systems Agency of New York City, it was revealed that Staten Island has a higher death rate from lung cancer than all of the other four boroughs of the City of New York, as well as the Nation as a whole, at all age levels. The same document also indicated that mortality from chronic bronchitis, emphysema and bronchiectasis on Staten Island exceeded that of the other boroughs and was more than 50% higher than the city as a whole. Based on the vital statistics concerning the Staten Island area set forth in the Health Systems Plan, it was the opinion of Dr. Melvin S. Schwartz, Assistant Commissioner for Biostatistics of the New York City Health Department, that there "seems to be a certain carcinogenic tendency in the Staten Island area" and "[t]o add anything further to a situation like this is it seems to me, an unwarranted risk." Later in the hearing, and shortly after an epidemiologic study had been conducted at the city's request by a team of experts headed by Dr. Schwartz, a report was issued with respect thereto entitled: "The Effect of Air Pollution on the Mortality and Morbidity Rates of the Borough of Staten Island."

In the compiling of data in connection with the study, an analysis was prepared from the 349 health areas set out in New York City, 10 of which comprised Staten Island. A health area contained between 15,000 to 30,000 population. Included in statistics for a health area were all births recorded on a health area basis for the previous half century. Also, 20% of the health areas of New York City having the highest number of deaths for health related reasons were designated as "Quintile one"; the 20% of the health areas having the second highest rate were designated "Quintile two", etc. By map overlays the relationship

between mortality rates and other factors were visually presented.

The overlays included:

"(1) percent persons 65 years of age and over in each health area in 1970",

"(2) percent persons 45-64 years of age in each health area in 1970", and

"(3) major sources and locations of sulfate and particulate emissions in New York City and New Jersey."

For the years 1975, 1976 and 1977, the study revealed that on a borough basis, Staten Island *ranked eighth highest out of the 30-city health districts for respiratory cancer mortality rate and sixth highest of the 30-city health districts for bronchitis/emphysema/asthma mortality rates.* With respect to *the 10 health areas* comprising Staten Island, 4 of the 10 were in the top quintile, i.e., the 20% of all health areas in New York City having the highest death rates due to respiratory cancer. Three other health areas of Staten Island were in the second highest quintile of mortality rates due to respiratory cancer. Thus, 7 out of the 10 health areas of Staten Island were among the 40% of health areas of New York City having the highest rates of mortality from respiratory cancer.

Moreover, when a map overlay was made of the point of sources of pollution such as sulphur dioxide, sulfates, smokeshade and particulate, it was found that the sources of pollution from New Jersey were concentrated in close proximity to the northern and western shores of Staten Island. (The proposed site herein is in the western shore area.) It was evident that prevailing westerly winds carry New Jersey's output of pollutants to Staten Island in heavy concentrations. From an examination of the then current vital statistics and demographic characteristics of Staten Island, the following sobering results were ascertained: (1) Staten Island as a borough, a health center district and a constellation of 10 health areas, compared to each other borough, health district, and other comparable health areas of New York City, has higher rates of death due to respiratory cancer and emphysema-asthma-bronchitis. (2) *All of the four Staten Island health areas that are in*

*Quintile one of respiratory cancer exhibit a population age distribution contrary to expectation. Each such health area has a younger age distribution than other city health areas with a higher respiratory cancer rate.* (3) Air pollutants from both New Jersey and the city contribute to the air quality finding over Staten Island.

I consider it significant that although one of PASNY's expert witnesses (Professor Lawrence A. Thibodeau) testified that he was not aware of any evidence that a health related effect would result from an increase in air pollution from the proposed plant, he conceded that preliminary analysis of a six-year study of concentrations of pollutants in Steubenville, Ohio, "seem[s] to indicate that there may be some health effect". Although he claimed the effect was "very minimal", Thibodeau recognized that the health effect from pollutants in Steubenville *"needs to be further assessed when more of the longitudinal data become available."* (Emphasis supplied.) Paradoxically, Thibodeau did not join in the recommendation of Dr. Schwartz that more detailed and exhaustive studies should be conducted in view of the fact that statistics gathered over a number of years strongly suggested that pollutants originating from the neighboring State of New Jersey were responsible for the high incidence of respiratory cancer on Staten Island.

It must also be noted that Thibodeau acknowledged that other studies (by Lave and Seskin) have indicated that mortality rates increase correspondingly as the level of total suspended particulates increases and there is evidence that, at very high levels, air pollution is associated with mortality. He also impliedly conceded that the cumulative effect of inhalation of pollution over the years may cause the elderly to be more susceptible to pollution than younger people. Also interesting is that although Thibodeau's conclusion that the state of the art did not permit any defensible statement of the (projected) health effect of the plant at Arthur Kill, the study on which he based his conclusion (by Dr. Schimmel) contained the following contrasting statement: *"Association between daily [particulate] levels as measured by smoke shade and daily mortality is positive and statistically significant."* (Emphasis supplied.)

Indeed, with respect to whether there was a sufficient relation between air pollutants and mortality, Thibodeau, in an earlier lecture, took the position that: "And so while we cannot use individual coefficients and we need to just [think] about it as an adjustment, *it can be worthwhile, however, for establishing that there is an effect.*"

Throughout this hearing before the Siting Board the experts for PASNY took the position that current measurements *show compliance with air quality standards at the Arthur Kill site,* and *that the proposed plant would not have detectable adverse health effects on Staten Island communities.* However, when confronted with a statement in a report by the National Academy of Sciences indicating that health effects could occur due to exposures to levels of sulfates below certain ambient concentration levels discussed in testimony by PASNY's experts, one of the same experts (Ferris) stated, *inter alia:* "Well, I think we have made the point [that] there are *no adequate data to make up a standard on sulfates.*" (Emphasis supplied.)

PASNY's experts also criticized certain studies relied upon by the opposing parties because they did not take into account such factors as cigarette smoking and "other important variables". However, Thibodeau did admit that there were other studies which added smoking as a variable, and came up with results fairly consistent with the opposing studies (Lave & Seskin, and Lipfert) which did not include such variable. Moreover another PASNY expert (Speizer) conceded that a study (Steubenville, Ohio) in which he and others were involved, indicated that exposure to air pollution had an adverse effect on smokers and nonsmokers alike, "the nature of which [was] more reporting of illness or phlegm production".

I am convinced that in concluding that emissions from the proposed plant's smokestack would have little or no adverse health effects upon Staten Island residents, PASNY's experts based such conclusion on flawed and incomplete data. For example, ambient sulfate concentrations for the Arthur Kill site were measured at stations in Manhattan, and ambient lead concentrations were measured at stations in Hempstead and Mamaroneck. Similarly, the

annual average background for trace metals was measured at a station located at 121st Street in Manhattan.

It is difficult to understand what relevance such off Staten Island stations could possible have to that borough's problems of pollutant concentrations. Moreover, it is extremely puzzling, to say the least, why PASNY ignored certain critical data from monitoring stations on Staten Island located at Borough Hall and the Fresh Kill Land Fill. For example, contrary to Dr. Cramer's testimony for PASNY that there was seemingly little difference with respect to sulfur dioxide concentrations on Staten Island between 1977 and 1978, experts for the City of New York Health Department pointed out that increases in the sulfur dioxide annual average from 1977 to 1978 were shown at the following monitoring stations in that borough: Susan Wagner High School — 70% increase; Goethals Bridge — 25% increase; and P.S. 26 — 58% increase.

Finally, on this issue of smokestack emissions at the proposed site, I believe the testimony of one of the city's Board of Health experts, Morton Israel, not only is relevant, but sobering and perhaps chilling. Israel revealed that he conducted a survey on Staten Island by sending questionnaires to physicians in that borough seeking information as to the frequency of visits to them by patients for respiratory conditions broken down by age groups to those under age 15, those 15 to age 44, and those from 45 to age 64. Earlier, a national survey had been made on generally similar groups. Contrasting the results from the national survey with those obtained from the Staten Island survey, Israel observed: "For the young population, the percentages of patient visits attributed to respiratory disease for the National Survey are similar to the percentage of physicians reporting respiratory diseases as the most common problem; 27.8% on a nationwide basis and approximately 35% for Staten Island. But in the general United States population, age groups 15 through 44 and 45 through 64 show a decline in respiratory conditions as causes for visits to doctors: 12.2% for the first and 11.3% for the second. *For Staten Islanders, the percentage remains generally at the same high level through age 44, and begins to decline in the older age groups.*" (Emphasis supplied.)

Based on the above statistics, Israel drew the following conclusions: "In the United States as a whole, as the average person grows older, he goes to the doctor one-half to one-third as often for respiratory ailments; in Staten Island, the proportion of physicians reporting respiratory diseases as the most common problem remains consistently high for patients through age 44, and this becomes especially high with primary care physicians. *In other words, in Staten Island, the average patient through age 44 remains at the same level of physician visits for respiratory complaints which he had as a child. The Staten Island community, according to their physicians is the equivalent of a large pediatric community for both the early and late adult years.*"

Adding to Israel's evaluation, was the following remark of Dr. Schwartz:

"One of the natural results of the high level of repeated insults to the respiratory systems reported by the survey is the end product of bronchitis, emphysema, asthma and respiratory cancer death * * *

"Rates for bronchitis, asthma and emphysema deaths have only been computed by the Health Department since 1969. For that 10-year period — the most recent, of course — Staten Island has led the rest of the Boroughs in death rate from bronchitis, emphysema and asthma."

## B. EMISSIONS FROM THE COOLING TOWER

In its application for the certificate, PASNY estimated that droplets of water released into the air via the proposed natural cooling tower would be approximately 11 gallons per minute and that 14,300 gallons of water per minute of the 222,000 gallons of water per minute taken in by the proposed cooling tower, *would be discharged back into the Arthur Kill as "blowdown".* Purportedly concerned about the effect of such discharge of droplets on air quality, and the effect of "blowdown" on water quality, PASNY in its application provided data from a 12-month monitoring of the Arthur Kill site from April, 1975 for various chemicals and fecal coliform (colon bacilli) bacteria. Such sampling *was limited to every four weeks, at approximately six-hour intervals,* except that in August of the same year, samples

were taken every three hours over a 27-hour period. One of the engineers, Grace Ekman, testified that the samples were not tested for chloroform, carbon tetrachloride, vinyl chloride of PCB's. *She also noted that fecal coliform (colon bacilli) counts in the samples taken in July, 1975, were 13 to 21 times the standard of 1,500 organisms per 100 milliliters of water set by the New Jersey State Department of Environmental Protection, and that no tests were conducted to identify specific pathogenic (disease developing) microorganisms, viral organisms or other enteric (relating to the intestines) bacteria that might be amongst the fecal coliform.*

On the issue of dispersions of viruses through the cooling tower, PASNY, in July, 1978, presented its own panel of witnesses.

One of them, Dr. Mark D. Sobsey, estimated that viral concentrations of the water in the proposed cooling tower could approximate 13,600 infectious units per liter. His estimates were based upon what the Siting Board broadly characterized as "available scientific literature", and data from a one-day sampling of the Arthur Kill water on May 15, 1978. Conceding that the *peak virus levels in sewage occur in the late summer and early fall, while the available data from the Arthur Kill was obtained only in May and June,* Sobsey arbitrarily multiplied by 100 the maximum viral concentration of 1.8 infectious units per liter ascertained from the May 15, 1978 test, and arrived at a figure of 180 infectious units per liter at the peak season. Further assuming that the cooling tower would take in such contaminated water, plus four per centum raw sewage, with a maximum viral concentration of 100,000 infectious units per liter, Sobsey then calculated that the "cooling tower drift" (water dispersed in the air) would contain 5,842 infectious units per liter, which "is only about one-third the ground level virus concentration derived from a worst case analysis."

Based on Sobsey's estimates, which as noted above were themselves founded primarily and speculatively upon a one-day sample of Arthur Kill waters in an off-peak season, a second member of PASNY's panel, Joseph J. Cramer, believed that under Sobsey's "worst case analy-

sis", application of the cooling tower model would result in a predicted maximum 24-hour airborne concentration of .00086 viruses per cubic meter. Such concentration, according to Cramer, would occur about 1.3 miles from the tower, and represents merely "a spatial and temporal maximum". He concluded by stating that if there was one individual at that point of concentration (1.3 miles from the tower), he would, based on the "worst case" analysis, be exposed to one virus every 50 days.

In stark contrast to the testimony of PASNY's experts, upon which the Siting Board speculatively reasoned that the virus emissions from the cooling tower were "acceptably small", witnesses for the State Department of Health, and its counterpart for the City of New York, gave voluminous testimony attesting to the danger from infectious organisms.

Specifically, Dr. Carl Stephen Kim testified that in a survey conducted by the United States Environmental Protection Agency in 1977, 30 of 33 organic compounds found in the Arthur Kill waters were considered to be toxic to varying degrees. Of those, chloroform and trichlorethlene were known to be animal carcinogens and others in the list were suspected to be carcinogens. In his opinion, the over-all toxicity of such "an exotic mixture of organics", would most likely be greater than expected due to synergism (co-operative action of discrete agencies such that the total effect is greater than the sum of the effects taken independently). He did not believe it possible that enough information had been gathered to provide a more reliable estimate of risk. He suggested, *inter alia*, that all the major organic compounds of toxicological significance in the Arthur Kill waters at the site of the proposed intake be identified.

Dr. David Axelrod, another member of the State Board of Health panel, testified that conceivably one of the enteric viruses that would be present in the Arthur Kill waters because of its raw sewage content would be hepatitis. According to Axelrod, a single infectious case of hepatitis resulting from the Arthur Kill water because of the aerosol exposure of the cooling tower, and the exposure to areas where droplets would result, had the potential for produc-

ing an epidemic of that disease. He noted that in 1959 the Interstate Sanitary Commission Record classified the Arthur Kill essentially as being equivalent to a sewer. Although he conceded that, from conversations with the Environmental Protection Agency, there had been an effort to improve the quality of water there since 1959, he stated there had not been a major change in the nature of the water.

Finally, Dr. Rudolph Deibel, another witness for the State Department of Health, noted that raw sewage, such as found in the Arthur Kill waters, contains not only fecal coliform, but also various viruses such as enteroviruses, polioviruses, coxsackie (related to poliomyelitis) A and B, echo (virus found in the gastrointestinal tract, sometimes associated with respiratory ailments and meningitis), neoviruses, adenoviruses and hepatitis A. Although the expected average virus density in domestic sewage has been estimated to be 700 viruses per 100 milliliters of water, as many as 46,350 viruses per 100 milliliters have been detected. While all sewage and water treatment processes remove or destroy viruses, no method is likely to remove all of the viruses found in sewage or raw water.

Deibel also asserted that it would take many hours of heating water in a cooling tower between 40 and 50 degrees Centigrade (106 to 122 degrees Fahrenheit) before such procedure would have a considerable effect in wiping out or inactivating viruses. He also noted that an epidemic of enterovirus at Fort Dix, New Jersey, arose from one infectious unit per 6,000 up to one per 60,000 liters of air.

Augmenting the significant testimony given by the State Department of Health experts was the following adduced from experts of the New York City Department of Health:

Dr. Stephen J. Millian testified that Dr. Sobsey's use of 50,000 infectious units as representative of the total concentration for all viruses in raw sewage was erroneous. He pointed out that in the study relied upon by Sobsey, 61,500 infectious units had been recovered in a single sample. Moreover, Sobsey only estimated the concentration of neoviruses and made no estimates of rotaviruses, hepatitis A,

norwalk or related gastroenteric strains. Furthermore, in equating one plaque-forming unit (PFU) to one infectious unit (IU), Sobsey, according to Millian, underestimated the true measure of infectious doses that may be responsible for a single plaque. He also observed that Sobsey did not deal with the likelihood that viruses occur in clumps or aggregate when shed in feces. It was Millian's opinion that 219,500 plaque-forming units is "representative" of the worst case concentration of viruses in raw sewage in nonepidemic years. He further asserted that seasonal peaks in the epidemic levels of enteric viruses could easily produce five or ten fold higher concentrations of "wild-type" viruses in receiving waters.

In concluding his direct testimony, Millian uttered the following sobering remark:

"Therefore, a truly conservative maximum 'worst case' approach to estimating total viral concentration must address probable underestimations due to both statistical and seasonal variations, thus necessitating the calculation of a figure on the order of $3 \times 5 \times 40,000$ PFU/1 = 600,000 PFU/1 for a non-epidemic year.

"I therefore recommend that concentrations of about this order of magnitude should be employed to estimate *the potential public health risks presented by viruses derived from heavily contaminated waters of the Arthur Kill."* (Emphasis supplied.)

Dr. Frederick M. Shofner, also testifying for the City Health Department, noted that Sobsey's calculations were based upon data derived, not from a cooling tower as proposed for the Arthur Kill site, but rather from a mechanical draft tower at Oak Ridge. He also pointed out that maximum airborne concentrations of smaller droplets would occur, not at 1.3 miles from the facility as claimed by Dr. Cramer, PASNY's expert, but rather at 10 kilometers or 6 miles, therefrom, and that such concentrations might even rise for distances of 30 kilometers, or 19 miles, downwind.

It must also be mentioned that another expert who testified for the City Health Department, Dr. James Halitsky, criticized Dr. Sobsey's and also Dr. Cramer's "worst

case" analysis. Both Sobsey and Cramer had concluded that if there was one individual at the greatest point of airborne concentration of droplets from the cooling tower such individual would be exposed to one virus every 50 days. However, Halitsky, using the calculations of Sobsey, pointed out that the latter, in concentrating on what was the chance of an individual catching one virus, overlooked the fact that many people in the area are "breathing with the same probability". Thus, the true approach is not the "individual's chance of catching one virus but rather *what is the probability of causing incidences in the entire population [385,000] surrounding the plant.*" (Emphasis supplied.)

Another expert witness in opposition to the cooling tower concept was Dr. Joseph L. Melnick, called on behalf of petitioner Guy V. Molinari. Melnick gave little or no credence to Sobsey's "worst case" estimates, because, *inter alia,* they were based on the highest viral concentrations in raw sewage taken from a study of samples from Santee, California, a town with a population of 12,000. He also noted that none of the studies relied upon by Sobsey were of raw sewage in highly populated urban areas.

Notwithstanding that the site for the proposed fossil fueled generating facility is within an area already exposed to sources of great industrial pollution originating for the most part from factories and refineries in nearby New Jersey, the majority has concluded that the determination of the Siting Board that the facility "will have acceptable impacts on the environment and on public health" was supported by substantial evidence, and that such determination was neither arbitrary nor capricious. Concomitantly it may be inferred from such conclusion that the majority is also in accord with the further statement of the board that "the potential impacts on public health at Arthur Kill are small enough to be acceptable and should not preclude use of the site if it is preferable on other grounds."

Yet, after having carefully read and evaluated the significant evidence in the record as to boiler and cooling tower emissions, the uppermost thought raised and recurring in my mind is just what segment of society would

agree that any adverse impact on the public health stemming from emissions from the proposed plant would be so minimal as to be "acceptable"? Conceivably, many if not most of PASNY bondholders might be amenable to the proposition that any ensuing risk to the public health would be insignificant. Moreover, in all likelihood the vast majority of the populace living outside the sphere of the area affected by the plant's construction would not have a strong opinion on the issue either way. However, I do not believe it logical to assume that any reasonable person residing within the Staten Island portion of what might be categorized the "carcinogenic corridor", an area already deleteriously affected by industrial pollution originating in New Jersey, would agree that additional toxic material spewed from the proposed plant into the environment would not pose an added significant risk to the public health. In similar vein, countless persons of today's generations residing on Staten Island within the "carcinogenic corridor", all too often on hot summer days during atmospheric inversions, have undoubtedly experienced the discomfort of burning eyes, and have had their nostrils assaulted by pungent and sickening odors largely resulting from New Jersey industrial pollutants being carried to their communities by prevailing westerly winds. I daresay they would view with jaundiced (and perhaps even burning) eyes a purportedly scientific prognosis in which it is declared that additional pollutants emitted from a proposed nearby generating facility, into an already befouled environment, would not constitute an added risk of serious consequence to the public health.

Stripped of all the technical jargon cluttering the record on the effect upon the environment and public health, PASNY's contention that such emissions from the cooling tower would not deleteriously affect the environment and public health is based upon patently inadequate, incomplete and meager evidence submitted by it at the hearing before the board. Uncontroverted by PASNY, and given little if any weight by the board, is the fact that the Arthur Kill is a highly polluted waterway, the proposed plant is located in close proximity to a greatly contaminated portion of the Arthur Kill, and pollutants in unknown but

possibly hazardous levels will be emitted from the plant's cooling tower, and dispersed into areas already plagued by a high incidence of respiratory diseases.

Despite the highly contaminated condition of the Arthur Kill, PASNY's experts based their findings that the cooling tower's emissions would not adversely affect the public health, upon data submitted from a one-day sampling of its waters for viruses. Such sampling was taken during an off-peak season of the year. Similarly, PASNY admitted that organic chemical sampling of the Arthur Kill waters was conducted on only one day from the pier adjacent to the proposed site. Notwithstanding such obviously superficial exploratory action, the board in its final order and opinion cavalierly states: "PASNY's analysis of the chemical content of the Arthur Kill and of the dispersion of small amounts of organic chemicals by the proposed plant provides a sufficient basis for concluding that the expected emission of these substances is acceptable and does not present a significant risk to public health."

Also noteworthy of mention at this time is that in support of PASNY's "worst case analysis" of viral concentration in order to evaluate the potential adverse health impact (based solely on the one-day virus sampling) Dr. Sobsey, PASNY's virologist, admitted that he adopted the methodology and sampling techniques employed by Brookhaven National Laboratory in its recovery of viruses from the Arthur Kill estuary. Ironically, however, the record reveals that Brookhaven clearly had serious doubts and second thoughts later with respect to the thoroughness and reliability of the methodology and sampling techniques it used, as is evident from the following remark found in its ensuing report: "The Arthur Kill study conducted by Brookhaven National Laboratory during May–June 1978 was limited both in *seasonal scope,* and *sampling frequency. Virus recoveries from a few samples (24) taken during a one-month period do not accurately reflect likely recoverable virus occurrence on a year-round basis. Furthermore, the reported virus concentrations must be considered as representing a fraction of the total virus numbers likely present in Kill waters."* (Emphasis supplied.)

It is obvious therefore that PASNY's use of a methodology and technique for sampling of the Arthur Kill waters, disowned by its creator as being "limited both in seasonal scope, and sampling frequency", and "not accurately reflect[ing an] * * * occurrence on a year-round basis", did not satisfy the requirements of section 142 (subd 1, pars [b], [c]) of the Public Service Law, pertaining, respectively, to the requirements that in an application for a certificate the applicant submit information and materials pertaining to alternate sites and sources of power, and, *inter alia,* the reasons why the proposed site is best suited to promote the public health and welfare, as well as studies of the expected environmental impact and safety of the facility "sufficient to identify (i) the anticipated gaseous, *liquid and solid wastes to be produced at the facility",* etc. (Emphasis supplied.)

With respect to the portion of the hearing pertaining to public health risks associated with fossil fuel combustion (boiler) emissions, I direct my attention at this time to the approximately one page "Discussion and Conclusions" promulgated by the Siting Board on this extremely important subject. After summarizing the contrasting evidence and arguments raised by the parties, the board gave the following statements which it considers a sufficient basis for its conclusion that the proposed plant would not prove a significant risk to the public health:

"The record presents a range of risks of adverse impact from a plant at Arthur Kill * * * *Each of the studies presented by the witnesses has its strengths and weaknesses, and we are unwilling either to consider any of them entirely definitive or to discount any of them as have the Examiners. Our reluctance to endorse any one presentation * * *, simply reflects the difficulties and uncertainties that must be faced when an attempt is made to trace subtle influences in a large and diverse human population.*

"We *thus cannot conclude on this record that the plant's boiler stack emissions will, as a certainty, have no adverse impact whatsoever on public health.* PASNY may turn out to be right in seeing the risk as negligible, but prudence suggests assuming a risk somewhere within the range that emerges from the record as a whole. *After giving due*

*weight to the various studies presented on that record, we conclude that the facility's likely impact on public health in New York City and the surrounding area is acceptably small, and will be outweighed by the plant's benefits."* (Emphasis supplied.)

From a cursory reading of the inadequate, skimpy and brief statement above, it is manifestly evident that the board has furnished no rational basis to support its conclusion that the likely impact of emissions from the boiler stack would be "acceptably small". Subdivision 2 of section 146 of the Public Service Law states, *inter alia:* "The board shall issue, with its decision, an opinion *stating in full its reasons for its decision."* (Emphasis supplied.) If anything, the board has set forth, with respect to the issue of boiler emissions and their effect on the public health, not the "full *** reasons" for its decision, but, rather an *absence of reasons* (i.e., "[e]ach of the studies presented by the witnesses has it strengths and weaknesses", "[w]e thus cannot conclude on this record that the plant's boiler stack emissions will, as a certainty, have no adverse impact whatsoever on public health"). Nowhere in its statement does the board indicate that the evidence adduced by PASNY demonstrates to a reasonable certitude that the facility's impact on the public health resulting from boiler emissions would be "acceptably small". Its placing the risk to the public health at the "acceptably small" range of the spectrum is not based on reasons set forth in the opinion, but rather because *"prudence suggests assuming a risk somewhere within the range that emerges from the record as a whole."* Simply put, the "reasons" given by the board for its decision on the boiler emission issue attained neither the quality nor breadth of the type envisioned by the legislators who drafted section 146 of the Public Service Law.

Similar to the holding of this Bench that PASNY, under section 146 (subd 2, par [d]) of the Public Service Law has the burden of proving that applicable local laws and regulations are unreasonable and unduly restrictive, I also believe that pursuant to section 142 (subd 1, par [e]), PASNY has the burden of proving that a proposed facility (including its boiler emissions), is not "incompatible with health and safety". In administrative proceedings the gen-

eral rule is that an applicant for relief, benefits, or a privilege, has the burden of proof (73 CJS, Public Administrative Bodies and Procedure, § 124; see, also, 73 CJS, Public Utilities, § 53).

Returning to the statement and conclusion on the boiler emission issue, it is apparent that the board did not accord significantly greater weight to the evidence of one side or the other (i.e., "[e]ach of the studies presented * * * has its strengths and weaknesses", "[o]ur reluctance to endorse any one presentation * * * simply reflects the difficulties and uncertainties * * * when an attempt is made to trace subtle influence in a large and diverse human population"). In fact the entire statement is permeated with indecisiveness, vacillation and doubt. Such being the fact, it is patently evident from the statement that the board tacitly admits that PASNY did not meet its burden of proving the proposed facility located at the Arthur Kill site would not be "incompatible with health and safety" at least with respect to boiler emissions (Public Service Law, § 142, subd 1, pars [b], [e], cl [i]). It follows, therefore, since PASNY had not met its burden of proof on the boiler emissions issue, that the board erred in granting a certificate of environmental compatibility and public need. If the evidence before a commission (or an administrative hearing board) is such as to raise in the minds of the commission legitimate doubts as to the existence of essential facts, the commission *must rule* against the application on the ground that the applicant did not sustain his burden of proving to the satisfaction of the commission that the facts were as claimed (*Neumann v Industrial Comm.,* 257 Wis 120). The burden cannot be shifted by a commission's adopting premises for a decision not supported by the evidence (*Utah Constr. Co. v Berg,* 68 Ariz 285). It should again be observed that the board reached its ultimate conclusion that the amount of boiler emissions from the facility would have an "acceptably small" impact on the public health not on evidentiary facts, but on the basis that "prudence" suggests that the board *assume* a risk "somewhere" within the range of risks submitted by the parties in the adversarial hearing. However, the law is settled that the findings of an administrative board may not rest on

surmise, conjecture, or speculation (or an assumption) or on the personal opinion of the board (*Matter of Monachino v New York State Liq. Auth.*, 12 Misc 2d 666, revd on other grounds 6 AD2d 378; 73 CJS, Public Administrative Bodies and Procedure, § 126).

Despite the strong doubts the board evidently had as to the possible effect boiler emissions might have on the public health, as reflected in its conclusion, it nevertheless issued the certificate authorizing construction of the proposed facility based largely, if not primarily, on PASNY's one-day samplings of the Arthur Kill for viruses and chemicals. However, in directing PASNY to conduct a further one-year postcertification monitoring of the estuary for the same materials, the board clearly reflected its own doubt as to the limited sampling it impliedly found to be sufficient.

I find nothing in article 8 of the Public Service Law which remotely suggests that the board has the authority to order such a research program after certification (see *Atwell v Power Auth. of State of N. Y.*, 67 AD2d 365, 380, *supra*).

CONCLUSION

Notwithstanding the fact that PASNY's experts on more than one occasion conceded (somewhat reluctantly) that not only statistical studies made by their counterparts in opposition, but theirs as well, have indicated a direct relationship of air pollution to the incidence of death and illnesses from respiratory diseases, PASNY has preferred in this case to dwell upon the shortcomings of the studies made by its adversaries (and so acknowledged by the latter) and slough off such evidence of the correlation with a confusing conclusion that the "state of [the] art does not permit a defensible" statement of the projected health effect of the Arthur Kill plant. In the face of the significant evidence adduced by PASNY's opponents of the high incidence of deaths and illnesses resulting from respiratory diseases, and its relation to industrial air pollution, I find PASNY's reliance on patently inadequate tests and its unwillingness to participate in, or conduct, further relevant statistical studies in connection with the proposed

site, to be callous and decidedly not in the best interest of the public in general.

I have no quarrel with the proposition that modern technology (which includes the generating of electric power) has brought countless benefits to society. Yet, unfortunately, I am also cognizant that insufficient research and experimentation at the outset into potential aftereffects have resulted in our being ill-equipped and even helpless at times to combat serious problems that have accompanied the benefits. Our imaginations were stimulated by what was to be our rewards from the harnessing of nuclear energy. However, little or no thought at the outset was directed to the disposal of nuclear waste and the dangers of radioactive fallout. Today many of our estuaries (including the Arthur Kill) are no more than floating industrial garbage dumps because little or no controls were instituted or pertinent studies conducted beforehand. These are just two vivid examples of the serious problems that "progress" has wrought because of insufficient research and inadequate testing.

Finally, it has been said that those who ignore history are condemned to repeat it and therefore condemned to live with it. What I truly fear is that today's generations, because of patently inadequate testing of the Arthur Kill waters, and rejection of significant evidence connecting air pollution with the high incidence of deaths and nonfatal illnesses on Staten Island, may well be condemning innumerable persons of future generations to early death based on a specious conclusion that *"the potential impacts on public health at Arthur Kill are small enough to be acceptable."*

I have "carefully parsed" (according to the majority) and delved conscientiously and assiduously into all of the voluminous and highly technical evidence in this record, and have sifted it thoroughly for competency, relevancy and substantiveness. Substantial evidence is not a talisman used by a court under which it automatically fixes its imprimatur on an administrative determination. Rather, it is a standard of review that requires a court to delve deeply into the record to determine the rationality of administrative action (*Matter of Cortland-Clinton, Inc. v*

*New York State Dept. of Health,* 59 AD2d 228). A court reviewing substantiality of evidence upon which an administrative agency has acted exercises a genuine judicial function and does not confirm a determination simply because it was made by such agency (*300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176). To do otherwise would be an abdication of judicial responsibility.

Without belaboring my arguments on the issues of "Boiler Emissions" and "Emissions from the Cooling Tower", I reiterate that the expert testimony of PASNY's witnesses to the effect that emissions from the proposed power plant will not adversely affect the public health, together with the results from patently inadequate and superficial samplings of the Arthur Kill waters, on which such testimony is based, does not constitute a rational basis to support the Siting Board's findings that the public health impact of both boiler and cooling tower emissions would be minimal.

MANGANO, THOMPSON and BRACKEN, JJ., concur with MOLLEN, P. J.; TITONE, J., concurs in part and dissents in part, with an opinion.

Petitions granted to the extent that the determination of the New York State Board on Electric Generation Siting and the Environment, dated July 22, 1981, is annulled, on the law, without costs or disbursements, and the matter is remitted to the Siting Board for a rehearing on the question of whether the proposed facility is designed to operate in compliance with local laws and regulations or, in the alternative, that said local laws and regulations are unreasonably restrictive as applied to the proposed facility.