OPINION OF THE COURT
Thomas E. Mercure, J.
This is a proceeding by petitioners, Washington County Cease, Inc. (CEASE), and David A. Pulver and Merrilyn Pulver, instituted pursuant to CPLR article 78. The proceeding requests judgment vacating the determination of the Industrial Hazardous Waste Facility Siting Board (Board), which granted a certificate of environmental safety and public necessity (Certificate) to the Department of Environmental Conservation (Department), for the siting of a dump for toxic PCB waste in the Town of Fort *208 Edward, Washington County, and the determination of the Commissioner of Environmental Conservation (acting through Irwin H. King, his designee) which granted a permit to the Department for such dump as a solid waste management facility.
In this article 78 proceeding, no issue has been raised as to the existence of substantial evidence in support of the determination of either the Board or the Department. Rather, petitioners predicate their right to relief on the grounds the determinations were: (1) made in violation of lawful procedure; (2) affected by an error of law; and (3) arbitrary and capricious and an abuse of discretion.
Petitioners aver that the CPLR 7803 (subd 3) questions for review in the proceeding are as follows:
1. Is the State, as an applicant for a Certificate, subject to the statutory limitation that the application must be denied if the facility for which the Certificate is sought would be contrary to local zoning (ECL 27-1105, subd 2, par [f])?
2. If the State is subject to such limitation, is the proposed PCB dump in the “Agricultural-Residential Zone” of the Town of Fort Edward contrary to the Fort Edward Zoning Ordinance as a matter of law?
3. Could an application for a Certificate be filed, the Board convened and an adjudicatory hearing be held thereon prior to the Department’s adoption of rules setting forth application requirements and siting criteria in view of ECL 27-1103 (subds 1, 2, 3) and 27-1105 (subd 1, subd 2, par [a])?
4. Are Richard Persico’s dual roles as general counsel for the Department and chairman of the Board inherently incompatible as a matter of law, thereby requiring that his vote as a member of the Board in favor of granting the Certificate to the Department be stricken?
5. Did the Department’s failure to give public notice of the application in the manner prescribed by law violate lawful procedure and petitioners’ due process rights?
This proceeding was commenced by service of a notice of petition and petition dated August 16,1982 and a supporting affidavit of David and Merrilyn Pulver, sworn to August 16, 1982, on or about August 20, 1982, returnable on *209 September 16, 1982. On September 10, 1982, the respondents served their answer seeking a dismissal of the petition, alleging that the moving papers do not allege facts which establish a legal right to the relief sought.
I. THE FACTS
The Department made an application to the Board for a Certificate, and to itself for permits and variances, to carry out its proposed Hudson River PCB Reclamation Project (Project). This Project involves the removal of dredged materials containing polychlorinated biphenyls (PCB’s), toxic chemicals, from a portion of the bed of the Hudson River (between Lock 2 of the Champlain Canal and the Village of Fort Edward), and thereafter, placing the dredged material within a secure land-burial facility (the “containment site”) located in the Town of Fort Edward, all at a cost of $26,700,000 in public funds.[1]
The proposed “containment site” for the PCB dredge spoils, known as “site 10”, is approximately 250 acres in size and is located approximately 2.5 miles south of the Village of Fort Edward in the Town of Fort Edward. The site is located within Washington County Agricultural District No. 27 and is surrounded by several dairy farm operations.
Site 10 has been continuously zoned since 1963 by the Town of Fort Edward as “Agriculture-Residential”. The town’s zoning ordinance lists nine “permitted uses” within the agriculture-residential zone. The permitted uses pertain to agricultural buildings and uses, nurseries and greenhouses, agricultural industries, single-family homes, churches, public parks, schools, signs and advertising, and governmental uses and buildings including police and fire stations.
The project requires permits and approvals from the Board, the Department, the United States Army Corps of Engineers, the United States Environmental Protection Agency, and the State Department of Transportation.
*210 On or about August 12,1981, Governor Carey appointed members to an Industrial Hazardous Waste Facility Siting Board, which was constituted to conduct an adjudicatory hearing on the application for a certificate of environmental safety and public necessity for the subject project.[2]
The Board was represented by its counsel, Robert Feller, Esq.[3]
As a consequence of the concurrent submittal of applications to both the Board and the Department, and the interrelationship of the issues to be determined by both bodies, it was determined to be in the public’s interest to hold a combined hearing by the Board and the Department on the proposed Project. To increase the efficiency of this joint hearing, administrative law judge (ALJ) Robert S. Drew for the Department, and Richard A. Pérsico, as chairman of the Board, entered into an agreement whereby ALJ Drew would have authority to preside at and to conduct all business of the adjudicatory hearing and any related legislative sessions and ALJ Drew and the members of the Board would jointly and individually have the right to summon and cross-examine witnesses.
A notice of joint public hearing dated August 26, 1981, scheduling a joint hearing before the Department and the Board was mailed to various municipal officials, the members of the Board, Department staff, and to all known property owners located within one-half mile of the proposed Project site. A copy of this notice was also published in the Department’s Environmental Notice Bulletin on August 26, 1981. Thereafter, supplemental notices were also published in the Environmental Notice Bulletin on September 2, 9 and 30,1981, respectively, to make various corrections relative to the combined hearing for the proposed Project.
The aforesaid notice and the supplemental notices were also published in the Glens Falls Post Star on September 3, September 15 and October 6, 1981, respectively.
*211 No notice ever correctly, accurately and completely identified all the applications made by the Department.
Notwithstanding the fact that the hearings ended on January 21, 1982, regulations (known as part 361 regulations [6 NYCRR]) setting forth application requirements and siting criteria for the Certificate did not become effective until February 24,1982. The Board, over the objection of petitioner CEASE, proceeded with the adjudicatory hearings with draft part 361 regulations, which were revised twice during the proceedings.
The joint public hearing was subsequently commenced before ALJ Drew on October 1, 1981 at 7:00 p.m. in the Washington County Courthouse and, pursuant to adjournments duly taken, was continued on November 4, 5, 9, 10, 12,13,16, 17, 18, 19, 23, 24 and 30; December 1, 2 and 16, 1981 and January 7, 12 and 21, 1982.[4]
The petitioner, Washington County Cease, Inc., is a not-for-profit corporation which was incorporated in New York in 1981. CEASE was granted full-party status at the prehearing conference and was represented by counsel through the entire adjudicatory hearing. Its members, officers and directors are persons who live, work and/or own real property in Warren, Washington and Saratoga Counties, in the vicinity of the portions of the Hudson River which would be affected by this project and the site where the respondents propose to create a PCB dump. CEASE has approximately 200 members.
Petitioners, David and Merrilyn Pulver, own and operate a dairy farm in the immediate vicinity of the proposed dump site.
On April 22, 1982, the Board issued its decision, with five affirmative votes. The Board, in pertinent part, stated the following:
“The Siting Board as lead agency prepared a Final Environmental Impact Statement (‘FEIS’) which was adopted on April 7, 1982. A review of this FEIS and the complete record of the adjudicatory public hearing has *212 collectively afforded an adequate basis for our finding that the requirements of the State Environmental Quality Review (‘SEQR’) as set forth in Environmental Conservation Law (‘ECL’), Sec. 8-0109 and 6 NYCRR, Part 617, have been met and that pursuant to ECL, Sec. 8-0109.8 and 6 NYCRR, Sec. 617.9(c), consistent with social, economic and other essential considerations, from among the reasonable alternatives, the Applicant’s proposed Project, as modified below, will minimize adverse environmental impacts revealed in the environmental impact process.
“Further, based on the record of the adjudicatory hearing and the final environmental impact statement, the Board makes the following findings with respect to the applications for a certificate of environmental safety and public necessity:
“1. Residential areas and populations contiguous to the proposed site will not be endangered by the construction, operation and maintenance of the facility;
“2. The construction, operation and maintenance of the facilit}^ is consistent with local zoning and land use regulations in force upon the date of the application for the facility;
“3. The site conforms to the siting criteria as set forth in 6 NYCRR Part 361; and
“4. The facility is needed and its construction, operation and maintenance is in the public interest.
“The Siting Board has determined to issue the Certificate of environmental safety and public necessity approving the construction, operation and maintenance of the Project as applied for with the special conditions set forth in Appendix ‘A’ to this decision.”
On April 17,1982, the commissioner issued a decision in which he affirmed the report of ALJ Drew and directed the Department staff to issue to the applicant the required approvals and permits subject to the conditions specified in the report.
At the prehearing conference on September 24,1981, the petitioner CEASE made a motion alleging that the filing of the applications and the convening of the Board was invalid and premature since the Department had not pro *213 mulgated final rules and regulations for the Board and thus, all proceedings should be suspended until such rules were adopted. This motion was denied on the basis that the provisions of ECL article 78 (tit 11) are self-executing and that, after September 1,1979, upon the filing of a complete application, the Board has an obligation to act upon such application. It was further noted that draft regulations (6 NYCRR part 361) had been prepared and made available to the parties and that these draft regulations would govern during the hearing, pending the promulgation of final regulations. The petitioner CEASE renewed this objection after the close of the hearing, and the Board concurred in the aforesaid ruling of ALJ Drew.
On November 4,1981, the petitioner CEASE moved that the hearing be suspended since the notice of public hearing did not contain a specific reference to the applicant’s request for two variances under the requirements of 6 NYCRR part 360. ALJ Drew reserved decision on this motion. Throughout the hearing, testimony from various witnesses relative to the two requests for variances was permitted. At the last hearing session on January 21,1982, the ALJ ruled that ample testimony having been presented throughout the hearing regarding the requests for variances and notwithstanding the fact that specific reference to these variances had not been included in the original hearing notices, the over-all Project had been sufficiently noticed and no further publication on the requests for variances would be required.
On January 7, 1981, the petitioner CEASE made a motion for summary denial of the pending application by the Board based on the claim that the applicant had not shown that it could comply with the intent and meaning of the local zoning ordinance of the Town of Fort Edward. ALJ Drew denied this motion, holding that the question of whether the Department is subject to local zoning and, if so, whether the proposed Project fits the interpretation of the zoning ordinance are questions which the Board would ultimately have to decide following its review of the completed record.
In its decision, the Board stated, in pertinent part:
*214 “We, therefore, conclude that the Statute is not one which subjects the State to local land use controls. Accordingly, in the absence of applicable zoning or land use controls, the Board is compelled to find that the application is consistent with the local zoning and land use regulations * * *
“The site under consideration is zoned residential-agricultural (R-Ag). The zoning ordinance specifies that, among other uses, land in R-Ag districts may be used for ‘governmental buildings and uses including police and fire stations’. Although CEASE offered testimony to demonstrate that this provision was not intended to include a state owned hazardous waste landfill as a permitted use, the Board does not find any precedential interpretation of the ordinance supporting this view. On its face, the ordinance provides for governmental uses. No distinction is made as to which level(s) of government were intended by this language. No credible evidence was presented to demonstrate that anything other than a plain language should be applied in this instance.”
After the close of the hearing, on February 3, 1983, the petitioner CEASE filed a motion to recuse wherein it demanded, pursuant to section 303 of the State Administrative Procedure Act, that Richard A. Pérsico, chairperson of the Board, disqualify himself from participating in any deliberations of the Board regarding the instant application, and that said Richard A. Pérsico refrain from participating in the final decision of the Board on the ground that said Richard A. Pérsico is general counsel to the Department of Environmental Conservation, thus giving rise to an inherent conflict of interest, which makes it impossible for him to deliberate and make a determination in an impartial manner as required by the State Administrative Procedure Act. This motion was denied by the Board on March 17, 1982. In denying this motion, the Board (absent chairman Pérsico) concluded that the allegations were insufficient to sustain the motion and that the motion was not timely.
II. COMPLIANCE WITH LOCAL ZONING
a. is the state subject to eel 27-1105 (subd 2, par [f])?
*215 On January 7, 1981, the petitioner CEASE made a motion for summary denial of the pending application by the Board based on the claim that the applicant had not shown that it could comply with the intent and meaning of the local zoning ordinance of the Town of Fort Edward. ALJ Drew denied this motion, holding that the question was ultimately for the Board.
It is a well-established principle of law that the State of New York and its agencies are not required to conform to the zoning regulations of the several municipalities. Zoning ordinances are enacted pursuant to power granted by the enabling acts, and this does not include the power to regulate uses of land by the State itself. Nor does it include the power to limit uses by agencies of the State where such uses are established and maintained pursuant to State statutes. (New York Zoning Law & Practice [2d ed], § 9.04, p 429; 12 NY Jur 2d, Buildings, Zoning and Land Controls, § 175, p 171; Nehrbas v Incorporated Vil. of Lloyd Harbor, 2 NY2d 190.)
This principle of law may be overridden by specific legislation, and petitioners urge that such legislation may be found in ECL article 27 (tit 11). ECL 27-1105 requires the Board to deny the Certificate if the proposed project would be contrary to local zoning. (See, also, 6 NYCRR 361.4 [¶] [2]; 361.7 [b] [6]; [c] [4].) ECL 27-1105 (subd 2, par [f]) provides: “The board shall deny an application to construct or operate a facility if * * * construction or operation of such facility would be contrary to local zoning or land use regulations in force on the date of the application”.
Whether or not the State must comply with local zoning depends upon the intent of the enabling statute. In Valvo v Urban Dev. Corp. (71 Misc 2d 335), the court held that a low income housing project did not have to comply with the local zoning ordinance because subdivision (3) of section 16 of the New York State Urban Development Corporation Act (L 1968, ch 174) exempted such projects from local regulation. In Valvo (supra), the statute’s intent to preempt local regulations had been explicitly stated.
Where a State law does not clearly express an intent to pre-empt local regulation or where State law expressly requires the State to comply with local regulations, no *216 immunity from local regulations is afforded the State. For instance, in Matter of Ibero-American Action League v Palma (47 AD2d 998) the court held that the Mental Hygiene Law, as it pertains to the establishment of drug rehabilitation centers (former § 81.01 et seq.; former § 83.01 et seq.), showed no clearly defined intent to preempt reasonable local regulation of the location and construction of the centers. The court continued (p 998): “Indeed, the statute expressly confers upon the Drug Abuse Control Commission (DACC) the authority to promulgate regulations within the framework of establishing a drug abuse control program within the State (§ 81.09) and one such regulation provides that ‘To qualify for approval every applicant and every agency shall demonstrate to the satisfaction of the commission, its compliance with all applicable * * * local laws, ordinances, rules, regulations and orders pertaining to health, welfare and safety.’” (Emphasis added.)
The most recent case concerning the State’s susceptibility to local zoning is Koch v Dyson (85 AD2d 346). In Koch {supra), petitioners challenged a determination of the New York State Board on Electric Generation Siting and the Environment (Siting Board) which authorized the Power Authority of the State of New York (PASNY) to construct a fossil fueled power plant on Staten Island. The Siting Board, pursuant to section 146 of the Public Service Law, was required to determine “whether ‘the facility is designed to operate in compliance with applicable state and local laws and regulations issued thereunder’ ” (p 347). The Board, however, pursuant to section 146 (subd 2, par [d]), could “ ‘refuse to apply any local ordinance, law, resolution * * * or any local standards or requirements which would be otherwise applicable if it finds that as applied to the proposed facility such is unreasonably restrictive’ ” (p 347). The Siting Board concluded that PASNY, as a “State agency”, is exempt from local laws by virtue of sovereign immunity and shifted to the City of New York the burden of proving why certain local laws and regulations should be imposed as certificate conditions.
The court rejected PASNY’s contention that the Legislature, by using the word “applicable” in section 146 (subd 2, par [d]), intended to exempt PASNY from that provision, *217 because local enactments, by virtue of sovereign immunity, are not “applicable” to PASNY. The court held, in essence, that the clear language of the statute did not support PASNY’s position. With respect to the Siting Board’s determination that PASNY was immune, the court stated (p 370), “Since the Siting Board has been entrusted with the implementation of article 8 [Public Service Law], its interpretation of section 146 (subd 2, par [d]) is entitled to respect, but it is by no means dispositive”. (Emphasis added.)
On the issue of the burden of proof, the court stated (pp 372-373): “Both the legislative history and the Governor’s memorandum * * * make abundantly clear the legislative intent to compel compliance with the local laws and regulations, except in those extraordinary instances where PASNY establishes that such local laws and regulations are unreasonable. Thus it is not the city which bears the burden of proof, but PASNY which must demonstrate to the Siting Board that the local laws and regulations in question are unreasonably restrictive. Only in this way may the legitimate interests of a local community be furthered and protected as intended by the legislation.”
The wording of the enabling legislation for the siting of hazardous waste facilities is even more straightforward in its intent than the statutes in the Ibero-American (47 AD2d 998, supra) and Koch (supra) cases. By definition, ECL article 27 subjects the State to local zoning just like any other applicant; ECL 27-1101 defines “person” as “any individual, public or private corporation, political subdivision, government agency * * * or any other legal entity whatsoever.” The express language of the statute confirms the Legislature fully intended to subject the State to local zoning. And whether the State or the Department is the applicant is immaterial for there is an identity of interest. The Department is a creation of the State Legislature; all of the Department’s powers are legislatively given and its duties and functions are carried out in the name of the State of New York (2 NY Jur 2d, Administrative Law, § 8). Moreover, the phrase “or any legal entity whatsoever” signifies the intent of the Legislature not to limit the scope of the definition of “person”.
*218 The Legislature defined “person” using language that included any government agency and hence, the State itself. Subdivision 1 of section 102 of the State Administrative Procedure Act defines “agency” as “any department, board, bureau, commission, division, office, council, committee or officer of the state”. ECL 27-1105 (subd 1) states “no person may commence construction or operation of a new * * * ‘facility’, without having received a certificate * * * from the facility siting board”; and ECL 27-1105 (subd 2, par [f]) provides: “The Board shall deny an application to construct or operate a facility * * * if construction or operation of such facility would be contrary to local zoning”. The above-quoted statutory provisions unquestionably delineate a legislative scheme that mandates compliance with local zoning by all applicants, including the State.
Respondents urge that ECL 27-1107 clearly states that local zoning agencies are barred from requiring a permit or other form of approval after the Board has issued its Certificate to an applicant. However, this does not alter the requirements of ECL 27-1105 (subd 2, par [f]). As the Board stated in its decision: “It is our view that the Statute intended to place the administration of the zoning and land use regulations in the hands of a specially constituted siting board, which was composed of a broad base of members rather than allow the decision to remain in the hands of local zoning authorities. This siting board would, however, be bound by the terms of the locality’s existing land use controls.”
Petitioners also aver that, apart from the statutory destruction of sovereign immunity in this case, local regulation always applies when the State engages in a “proprietary” activity. They argue that a proprietary activity is one normally engaged in by the private sector and urge that even the applicant admitted that, “the legislation was primarily designed to encourage private companies in the industrial management field to come to New York State and set up facilities”, in their posthearing brief. Petitioners argue further that governmental functions are those associated with traditional government, or those mandated by law to be undertaken by government. They state that ECL *219 article 27 does not mandate that State government undertake the disposal of hazardous wastes.
As was stated in an annotation entitled “Applicability of Zoning Regulations to Waste Disposal Facilities of State or Local Governmental Agencies” (59 ALR3d 1244, 1255): “the governmental-proprietary distinction has been criticized by a number of commentators, often upon the basic ground that although it may be useful as a device for limiting the effect of governmental immunity from tort liability, it is not appropriate for the resolution of zoning conflicts. It has also been observed that the very vagueness of the governmental-proprietary distinction makes it virtually impossible to apply in an objective manner”.
That this is the case is evident from a review of the cases.
Early recognition of the proprietary nature of waste disposal is to be found in O’Brien v Town of Greenburgh (239 App Div 555, affd 266 NY 582). The court, in Nehrbas v Incorporated Vil. of Lloyd Habor (2 NY2d 190, supra), held that whatever the view may have been years ago, the disposition of refuse and rubbish must today be declared a governmental function. Similarly, Rochester v Rush (67 Misc 2d 328, affd 37 AD2d 795), observed that refuse disposal is clearly a governmental function. Also see Little Joseph Realty v Town of Babylon (41 NY2d 738) and Matter of Ruderman v Town Bd. of Town of Rosendale (58 AD2d 939), which both held the disposal of waste was a governmental function.
Although the court opines that the State is subject to the Town of Fort Edward Zoning Ordinance, the basis for this opinion is the express language contained in article 27, destroying sovereign immunity from local regulation in the case of hazardous waste disposal sites and not the governmental-proprietary distinction.
B. IS THE PROPOSED PCB DUMP CONTRARY TO THE FORT EDWARD ZONING ORDINANCE?
Section 25-8A of the Fort Edward Town Ordinance lists nine specific permitted uses in a residential-agricultural district of the town, to wit:
*220 1. All agricultural land uses, buildings and activities, including the growing of field, truck and tree crops, dairying, livestock raising, poultry raising and similar agricultural uses.
2. Nurseries and greenhouses.
3. Agricultural industries required by local agricultural production.
4. Single-family detached dwellings.
5. Churches and parish houses.
6. Public parks and playgrounds.
7. Governmental buildings and uses including police and fire stations.
8. Public schools and private schools offering general instruction.
9. Signs and advertising.
The Board determined that, even if the State has to comply with local zoning, the Project falls within subdivision 7 of section 25-8A of the Fort Edward Zoning Ordinance, which permits “governmental buildings and uses including police and fire stations” in the town’s “Residential-Agricultural” zone.
Lawrence Corbett, Esq., a town board member at the time of the adoption of the comprehensive plan and ordinance, was called as a witness by the petitioner CEASE.[5] Mr. Corbett testified as follows:
Q. I believe if you would look at page 12 and paragraph 4 and perhaps state the title on that page and then read paragraph four in its entirety?
A. Page 12 of the Comprehensive Plan is “Policy Statement of the Comprehensive Plan”. Paragraph 4 specifically refers to: “The Hudson River shore line and other natural agricultural settings of the town should be preserved and protected from adverse land uses”.
And again on page 13 of the Comprehensive Plan, a paragraph entitled, “Agricultural and Rural Residential Land Use Plan”. And the first two sentences in that paragraph state the following: “The land now in agricultural use represents a great natural resource to the town. The beauty of this land gives it an appeal which can and should be preserved.”
*221 Q. Thank you, Mr. Corbett.
Would you accept the quoted portions as a fair and accurate representation of your reflection of what the town policy was at that time?
A. Yes,_sir, I do. And I think it was reflected in the zoning ordinance that was adopted in August of 1963.
Mr. Corbett testified further:
Q. Would you read that subdivision to us?
A. Yes, sir. Subparagraph 7, “Governmental Buildings and Uses, Including Police and Fire Stations”.
Q. Now, could you give us, perhaps, some indication of what the intent of the Town Board was in its enactment of this Zoning Ordinance, specifically with reference to the Rural Agricultural Zoning District?
A. Mr. Walsh, I can answer that only to the best of my recollection. In 1963, the public — the Transportation Department for Washington County had their major area for trucks and highway maintenance located in the Village of Fort Edward. It was a very inadequate place for such a Department of Transportation facility, and there had been talk in the County and Town in 1963 of the State building a new facility for the Department of Transportation, Department of Highways.
That didn’t come to pass for another four or five years, and that facility is now located on Dix Avenue in the Town of Kingsbury, just north of the Village of Hudson Falls.
But the Town of Fort Edward was definitely interested at that time in trying to maintain that facility within the town limits. And to the best of my recollection, the inclusion of that language on page 2513 of the Zoning Ordinance was put in there for the purpose of possibly covering the construction of that highway facility.
Section 97 of McKinney’s Statutes directs: “It is a fundamental rule of statutory construction that a statute or legislative act is to be construed as a whole, and that all parts of an act are to be read and construed together to determine the legislative intent.”
Section 98 of McKinney’s Statutes directs: “generally a particular provision of an act is not to receive a special meaning at variance with the general purpose and spirit of the act.”
Section 113 of McKinney’s Statutes directs: “While general words in a statute ordinarily should be given their full significance in the absence of a legislative intent to the *222 contrary, their meaning may, in a proper case, be restricted.”
The phrase “including police and fire stations” in section 25-8A of the town ordinance is an indication of the type of governmental uses that the town board had in mind. If such were not the case, there would be no reason for the phrase.
The nine permitted uses are inherently compatible with one another and with the town’s comprehensive plan, which provided that natural agricultural settings of the town should be preserved and protected from adverse land uses. Viewed as a whole, the nine permitted uses listed in section 25-8A of the ordinance are entirely consistent with the residential-agricultural scheme established by the zoning ordinance. In its context, therefore, the “governmental buildings and uses including police and fire stations” category has to be interpreted as being limited to traditional and conventional government activities.
The respondents’ theory and the Board’s decision violate the principles of statutory construction set forth herein. That the Project is a permitted governmental use under subdivision 7 of section 25-8A is devoid of common sense; a toxic waste dump would clearly be an adverse land use in the center of a viable agricultural community.
The proposed Project is contrary to local zoning.
III. ADOPTION OF REGULATIONS
At the September 24, 1981 prehearing conference, petitioner CEASE moved that the application and the convening of the Board be ruled premature because the Department had not fulfilled its legislative mandate to adopt criteria prescribing the form and contents of an application for a Certificate. Petitioner CEASE’s motion to suspend all proceedings on the application until the Department officially adopted the regulations required by ECL 27-1103 was denied at the prehearing conference.
Notwithstanding the fact that the hearings ended on January 21, 1982, regulations setting forth application requirements and siting criteria for the Certificate did not become effective until February 24, 1982. The Board proceeded with the adjudicatory hearings with draft part 361 *223 regulations, which were revised twice during the proceedings.[6]
Petitioners contend the ECL 27-1103 clearly mandates the interpretation urged herein by them: “The commissioner shall also within one year from such effective date [of this section] adopt criteria prescribing the form and content of applications for a certificate of environmental safety, and public necessity to construct an industrial hazardous waste treatment, storage and disposal facility.” (Emphasis added.)
And ECL 27-1105 (subd 2, par [a]) provides: “[a]n application must be submitted to the department in the form required pursuant to subdivisions one and three of section 27-1103 of this title.” (Emphasis added.)
Petitioners argue that the unambiguous wording of these sections commanded the commissioner to adopt the necessary criteria and application form prior to any entity making a formal application.
Further, petitioners aver that the legislative mandate to “adopt” criteria required the Department to follow a specific procedure. The Environmental Conservation Law has its own provisions limiting the power of the commissioner to adopt criteria, rules and regulations. ECL 5-0107 (subd 2) states, in pertinent part: “Each environmental standard, criterion and rule and regulation having the effect thereof, and change thereto prepared and proposed by the commissioner pursuant to subdivision 2 of section 3-0301 shall be submitted to the [State environmental] board for approval * * * If the board refuses to approve the submitted matter, the commissioner shall not act contrary to such denial”.
And ECL 3-0301 (subd 2) states, in pertinent part: “the department, by and through the commissioner, shall be authorized to: (a) [w]ith the advice and approval of the [State environmental] board, adopt, amend or repeal environmental standards, criteria and those rules and regulations having the force and effect of standards and criteria to carry out the purposes and provisions of this act. Upon approval by the board of any such environmental standard, criterion, rule or regulation or change thereto, it shall *224 become effective thirty days after being filed with the Secretary of State for publication in the ‘Official Compilation of Codes, Rules and Regulations of the State of New York’ published pursuant to section 102 of the Executive Law.”
It is the position of petitioners, that, taken together, ECL 27-1103, 3-0301 and 5-0107 establish that the commissioner did not have the authority to convene the Board, nor entertain the present Certificate application until all of the above-cited steps necessary for the adoption of regulations had been taken.
A further argument advanced by petitioners is that the commissioner’s draft regulations were ineffective to set the ground rules for this proceeding because section 8 of article IV of the New York State Constitution provides: “No rule or regulation made by any state department, board, bureau, officer, authority or commission * * * shall be effective until it is filed in the office of the department of state”.
Therefore, the purpose of this constitutional provision is to assure public knowledge of the rules and regulations having the force and effect of law.
Respondents, arguing to the contrary, contend that in denying the motion of the petitioner CEASE to have the convening of the Board ruled invalid, the board held that the provisions of title 11 of article 27 were “self-executing” and thus, it had the obligation to act upon the application herein. The respondents argue that the Board’s construction of this statute, which enables the evident purposes of the Legislature to be effectuated is preferable to the construction urged by petitioners which would render the statute inoperative and nugatory. Respondents maintain that the promulgation of rules is something the commissioner was directed to do, but the absence of the promulgation of rules did not destroy the Board’s jurisdiction, nor place a moratorium upon any action under the title. Respondents urge that their construction would allow the intent of the Legislature to go forward.
In the court’s opinion, it was clearly the intent of the Legislature that regulations be adopted prescribing the form and content of applications before an application was entertained.
*225 Respondents place heavy reliance on Matter of Rochester Gas & Elec. Corp. v Maltbie (188 Misc 39, 41, affd 272 App Div 162) wherein the court stated, in pertinent part: “A statutory provision requiring an act to be done or a decision made by a public body within a given time is commonly regarded as directory, merely, and does not operate to terminate jurisdiction, unless the statute says so in language or by an indication necessarily to be drawn from the statutory context.”
The court, in Rochester Gas (188 Misc, at p 40, supra), was dealing with a statute that provided: “The decision of the commission granting or refusing the application for a rehearing shall be made within thirty days after the making of such application.” Forty days after the application for rehearing was made, the commission made an order granting an application for a rehearing.
In the instant case, the court would have no problem with the promulgation of regulations one year and 10 days from the effective date of ECL 27-1103 or for that matter, any time before an application was entertained. It is not the one-year period that is critical, but the fact that the regulations were not adopted before an application was entertained.
This is even more critical in the instant case because it is the commissioner of the Department who must adopt regulations governing applications, and it is the Department who is the applicant.
This court is of the opinion that Rochester Gas (supra), relied upon by respondents, might better serve the point of view of the petitioners. This court finds that the statutes in the instant case mandate compliance by the wording and their wording is unambiguous. An unstrained interpretation of the words “shall” and “must”, as used herein, can have no permissive meaning.
“The Legislature ordinarily uses appropriate language in statutes to express its intention and, as a general rule, if there is nothing in an act or surrounding circumstances to indicate a contrary intention, words of command are construed by the courts as peremptory.” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 177.) Their meaning must *226 be considered as having imperative or mandatory effect in the light of the statutory context.
Matter of Bizarre, Inc. v State Liq. Auth. (29 AD2d 500, opp dsmd 22 NY2d 721) is more to the point. In Bizarre (supra), the operator of a coffee house in New York City was refused a special on-premises liquor license by the New York City Alcoholic Beverage Control Board. The operator requested a hearing before the State Liquor Authority. A hearing ensued before a deputy commissioner, who disapproved the application and notified the operator. This was followed by a formal notice purportedly to be signed by the chairman of the authority to the same effect. The Appellate Division stated, in pertinent part, in its decision (p 502): “Even if there were validity to such delegation of power to Deputy Commissioners, in respect of the refusal to license, there is a basic irregularity in the failure of the Authority to have filed with the Secretary of State of the State of New York notice to the effect that a Licensing Board has been established by the State Liquor Authority presuming to have final power respecting the refusal of licenses. (See N. Y. Const., art. IV, § 8.) Certainly, a rule or regulation of such spacious scope delineating a deputy’s power vis-a-vis the public, is well within the ambit of this constitutional command. And failure to have filed renders ineffectual any efforts to clothe with validity the refusal of a license by the Licensing Board alone.” (Also see People v Cull, 10 NY2d 123.)
The instant case requires the same due process considerations and raises the same constitutional issues as Bizarre (supra). The enabling statutes herein created criteria to be utilized in formulating rules and regulations. Said rules and regulations are the foundation for the creation of the Board and delineate the parameters within which the Board might function. Without such regulations in place, the public would remain unadvised as to how it may proceed in any adversary position. The Board could accept or disregard any application at will without recourse to the criteria found in the enabling statutes (ECL 27-1103, 27-1105), thereby frustrating legislative intent without recourse.
In People v Cull (supra, p 129) the Court of Appeals stated: “The Constitution, in the clearest of language, *227 requires that every rule and regulation made by board, bureau, officer, authority or commission — ‘except such as relates to the organization or internal management’ of such office or agency — be filed in the office of the Department of State if it is to be effective.” And so it should be in the instant case. Here, the Board has before it an application created out of whole cloth with neither a rule or regulation to determine its validity. The Board conducted 22 sessions, taking testimony on said application without a guiding rule or regulation in place.
Respondents may not rely on draft regulations, nor may they rely on the adoption of the regulations after the close of all of the proof and before a decision was rendered. Respondents may not rely on the draft regulations because the State Constitution, the Administrative Procedure Act and the Environmental Conservation Law set out an elaborate process for the promulgation of regulations. The Legislature would not have gone to the effort if it were intended that draft regulations or bureaucratic notes could suffice as regulations. In the absence of regulations, there was not a reliable set of criteria upon which anyone could act.
IV. THE DUAL ROLE OF THE BOARD CHAIRMAN AND GENERAL COUNSEL TO THE DEPARTMENT
On February 3, 1982, after 21 days of hearing, the petitioner CEASE moved, pursuant to section 303 of the State Administrative Procedure Act, to disqualify Richard A. Pérsico from participating in any deliberation of the Board on the ground that his dual role of counsel to the Department and chairman of the Board were incompatible and amounted to a conflict of interests.
Section 303 of the State Administrative Procedure Act provides, in pertinent part, as follows: “Upon the filing in good faith by a party of a timely and sufficient affidavit of personal bias or disqualification of a presiding officer, the agency shall determine the matter as part of the record in the case, and its determination shall be a matter subject to judicial review at the conclusion of the adjudicatory proceeding”.
*228 The Board, absent chairman Richard A. Pérsico, denied this motion on the ground that the allegations were insufficient and the motion was not timely.
The motion was made some four months after the prehearing conference, but more than one month before the close of the record. The motion requested that Mr. Pérsico refrain from further participation in the deliberation of the Board and that he not cast his vote in the Board’s determination. CEASE did not request the Board to invalidate the entire proceeding because of Mr. Persico’s involvement with the Board prior to the motion to recuse him.
Petitioners argued that Mr. Pérsico should have recused himself because he was both general counsel to the Department and chairman of the Board, who rendered the decisive vote, and his failure to do so irreparably tainted the deliberations and decision of the Board. Petitioners maintain that their motion was made in a timely manner because deliberations and the ultimate decision would not take place until all the evidence was concluded and the record closed. Further, that the motion was made before the judging function was performed and at a time when there could have been a substitution for him.
Respondents argue that, first of all, the motion was not timely made and should have been made at the prehearing conference; secondly, that the motion was not supported by facts of an evidentiary nature showing that Mr. Pérsico had a personal interest in the outcome of the hearing; thirdly, that the commissioner himself could have been a member of the Board.
New York has codified the common-law rules for disqualification of Judges in section 14 of the Judiciary Law. This statute specifically disqualifies a Judge from taking part in the decision of any matter to which he is a party, or in which he has been an attorney, or in which he is interested.
Although the provisions of the Judiciary Law pertain only to courts of record, the common-law rule of disqualification applicable to Judges extends to every tribunal exercising judicial or quasi-judicial functions. (1 Am Jur 2d, Administrative Law, § 63.) The New York Court of Appeals has expressly recognized the common-law rule and *229 has applied it to administrative tribunals. In Matter of City of Rochester (208 NY 188, 192) the court stated that the rule that a Judge should never have the power to decide where he is himself a party is based upon the belief that: “Self-interest and selfishness are persuasive or compelling forces in all ordinary affairs and rare, indeed, is the person in whom mental rectitude and a clear and impartial judgment are not impaired by them in determining an issue between himself and another. It is, moreover, essential to the purpose and the perpetuity of the law as the supreme power enforcing justice and order among men that it and the tribunals which declare and administer it secure to themselves without intermission or substantial diminution the respect and confidence of those subject to their jurisdiction * * * ‘Next in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge.’ ”
The entity which applied to the Board was the Department. The presiding administrative law judge was Robert S. Drew, who was an employee of the Department. The chairman of the Board was Richard A. Pérsico, general counsel to the Department. The counsel to the Board was Robert Feller, an attorney employed by the Department. During the course of the hearing, the Department called some 16 Department employees as witnesses.
The Department is, at one and the same time, the applicant, the permit-issuing agency, a statutory member of the Board, the chairperson of the Board and legal counsel to the Board.
As Mr. Walsh set forth in his affidavit in support of the motion to recuse Mr. Pérsico: “Mr. Pérsico has been general counsel to the New York State Department of Environmental Conservation for several years. As General Counsel, he is in charge of DEC staff attorneys. Robert Feller has been a DEC staff attorney for several years and necessarily under Mr. Persico’s direct control * * * Messrs. Pérsico and Feller, in their DEC roles, have been involved in the on-going process of drafting the proposed Part 361 Regulations * * * The Department, as applicant, is represented by Malcolm Coutant, another DEC staff attorney, *230 who is under the direct control of Chairperson Pérsico on a day-to-day basis. At one point during the instant proceeding, I heard Mr. Coutant refer to Chairperson Pérsico as ‘my boss’.”
Richard A. Pérsico should have recused himself and not involved himself in deliberations and the Board’s decision. His dual roles as general counsel to the applicant and the chairman of the Board were inherently incompatible as a matter of law.
Petitioners’ motion was made in a timely manner before the record closed and deliberations commenced. The Board, consisting of 8 members, needed only 5 member votes to reach a determination. Mr. Persico’s participation in the Board’s final decision was not necessary for the Board to exercise its decision-making process. With regard to the timeliness of petitioners’ motion, Lewis Hallenbeck, the member of the Board representing the Department of Transportation, retired from State service in late December, 1981, after several sessions of the Board, and he was subsequently replaced by Charles Carlson, who cast an affirmative vote for the Project. In short, the judging function did not commence until the record was closed.
Although petitioners suggest that the motion was made at such time that a substitution could be made, in the court’s opinion, no employee of the Department or other designee of the commissioner should have served on the Board during deliberations and the rendering of a decision. (See 20 NY Jur 2d, Constitutional Law, § 406.) The due process clauses in the State and Federal Constitutions assure a hearing before an impartial tribunal.
Respondents maintain that, although a determination based not on a dispassionate review of the facts, but on a prejudiced or biased evaluation, must be set aside, a mere allegation of bias will not suffice. Further, that it would be absurd to expect that the general counsel to the Department, or any other member of the Department whom the Commissioner might designate, would have no opinions on the question of the disposal of PCB’s. Respondents aver that, while a party must be open-minded, he need not be empty-headed. In the court’s opinion, every member of the Board may very well have had preconceived notions; how *231 ever, it was only Mr. Pérsico who was general counsel to the applicant.
Respondents maintain further that the commissioner himself could have sat on the Board, rather than designating Mr. Pérsico. It is interesting that, on a part 360 application, the commissioner disqualified himself and designated one of his assistant commissioners on the grounds that he was not an impartial Judge of his own application. The same reasoning that led him to disqualify himself on the part 360 application should have led Mr. Pérsico to disqualify himself on the part 361 application.
For the foregoing reasons, the vote of Mr. Pérsico is stricken and the Board determination invalidated for failure to have the required minimum of five qualified and competent Board members approve the Certificate.
V. NOTICE OF VARIANCE APPLICATIONS
Petitioners contend that the failure to give notice of two applications for variances render the application by the Department incomplete and subject to further notice requirements.
The Department applied to itself for two variances from the standards which solid waste management facilities must meet: (1) from the requirement of 6 NYCRR 360.8 (c) (12) (iv), that hazardous dumps be “totally fenced and secured to prevent public access” and (2) from the requirements of 6 NYCRR 360.8 (c) (12) (i) (b), that “[n]o waste shall be closer than 10 feet to an aquifer [ground water]”.
Applications for solid waste disposal facilities are subject to the uniform procedures set forth in ECL article 78 (see ECL 70-0107, subd 3, par [Z]).
The “application” about which such statutory mandate speaks is the “application for a permit”. (ECL 70-0109, subd 1, par [a].)
As noted, ECL 70-0107 (subd 3, par [Z]) makes the siting of solid waste disposal facilities subject to uniform procedure. The rules and regulations (6 NYCRR 360.1 [i]) confirm that the uniform procedures apply to applications for variances (see 6 NYCRR 360.1 [g]) from the standards applicable to the siting, design and construction of solid waste disposal facilities.
*232 Consequently, the Department was required by statute and by its own regulations to give a specific type of notice of its application for variances from regulatory standards. No such notice was given, but the failure to provide such notice is not a fatal flaw which tainted all further proceedings on the Department’s application.
In Zelenski v Incorporated Vil. of Patchogue (51 AD2d 1055, 1056), where the decision of the zoning board of appeals was not a nullity for failure to comply with notice of requirements in time for an original hearing, the court stated that “[t]he notice requirement relied on by plaintiffs is not ‘jurisdictional’ in the sense in which plaintiffs seek to use that term [. Such use would be] overly technical [and] one which elevates form over substance.” In Zelenski (supra)i, as in the instant case, the record indicated that petitioners were indeed given notice, and the purpose of the notice requirement was, therefore, satisfied as the petitioners opposed the application. (See, also, Matter of Lovett v Flacke, 83 AD2d 718.) In the Lovett case (supra), the Appellate Division held that the parties in that matter were fully heard on the merits of a water supply application and were in no position to complain about the notices of hearing. The Lovett court stated (p 719): “it is contended an error in the notice of hearing vitiates the entire application process. While there is an obvious inadvertent error in the notice, petitioners appeared and were fully heard on the merits. They are in no position to complain (cf. Matter of Zartman v Reisem, 59 AD2d 237, 242).”
Notices for administrative hearings such as the hearing held in this matter need only be reasonable and sufficiently definite to inform the public of the nature of the proceeding and the hearing to be held. (State Administrative Procedure Act, § 301, subd 2, par [a]; ECL 70-0109, subd 2; 6 NYCRR 624.3; Blumberg v City of Yonkers, 41 AD2d 300.)
In the underlying administrative proceedings, the notices of hearing reasonably informed the petitioners of the certificate and permit applications. The failure to include specific reference to the various requests cannot be used to invalidate the entire proceeding. (See Lovett, supra.)
*233 Further, the admitted error as to notice of the two applications for the variances was rendered moot.[7]
Ample testimony was presented throughout the hearing regarding the requests for variances and, notwithstanding the fact that the specific reference to the requested variances had not been included in the original hearing notice, the over-all project was sufficiently noticed.
Petitioners fail to demonstrate any harm or damage on the over-all application by reason of the omission of the variance requests in the hearing notices.
VI. CONCLUSION
Pursuant to CPLR article 78, the decision of the Hazardous Waste Facility Siting Board made and filed on April 22, 1982, which approved and granted to the applicant, Department of Environmental Conservation, a certificate of environmental safety and public necessity in connection with the Department’s Hudson River Reclamation Project is vacated and set aside.
The Department of Environmental Conservation is directed to revoke any and all related permits which were granted as a result of the applicant first obtaining the certificate of environmental safety and public necessity.
The approvals are set aside because of the following errors of law and violations of lawful procedure:
1. The refusal to follow the statutory direction to deny the application for a Certificate where the proposed PCB dump in the “Agricultural-Residential Zone” of the Town of Fort Edward would be contrary to the Fort Edward Zoning Ordinance.
2. The processing of an application for a Certificate, the convening of the Board and the holding of an adjudicatory hearing prior to the Department’s adoption of rules setting forth application requirements and siting criteria as required by the enabling statute.
3. The failure of the Siting Board chairman, who cast the decisive vote, to recuse himself even though he was general *234 counsel to the applicant, said dual roles being inherently incompatible as a matter of law, and his said vote being stricken.

. James G. De Zolt testified that the project, as proposed, would involve the selective removal of approximately 1.2 million cubic yards of sediment, containing levels of PCB greater than 50 parts per million. He testified that 120,000 pounds of PCB will be removed.

. The Board, pursuant to ECL 27-1105 (subd 2, par [d], is composed of the Commissioners (or their lawfully designated alternates) of the Departments of Environmental Conservation, Health, Transportation, and Commerce, the Secretary of State (or his lawfully appointed alternate) and three ad hoc members, two of whom are residents of the judicial district in which the proposed facility is -to be located.

. Mr. Feller is an attorney in the Department’s central office, who was assigned as a staff counsel to the Siting Board for the subject proceeding.

. The stenographic record for each hearing session was transcribed and printed in a separate numbered volume starting with volume 1 for the prehearing conference on September 24, 1981 and concluding with volume 22 for the last session on January 21, 1982. The record consisted of 3,287 pages which the court has read in its entirety.

. Lawrence E. Corbett, Esq., was a Fort Edward Town Board member for eight years, his last year being 1963. The comprehensive plan was prepared in 1961 or 1962, and the zoning ordinance adopted in August, 1963.

. The court was not made aware of the specific revisions, but petitioners’ counsel acknowledged that the revisions did not go to the “heart and soul” of the regulations.

. In the decision of the Board, it was determined that there was no need for a variance from 6 NYCRR 360.8 (c) (12) (i) (b) and the request for a variance from 6 NYCRR 360.8 (c) (12) (iv) was denied.